Ralph T. AARON, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 59576.

Missouri Court of Appeals,
Western District.

July 30, 2002.

Kent E. Gipson, Kansas City, MO, for appellant.

Andrea M. Follett, Assistant Attorney General, Jefferson City, MO, for respondent.

Before ULRICH, P.J., BRECKENRIDGE and HARDWICK, JJ.

PATRICIA BRECKENRIDGE, Judge.

Ralph Aaron appeals the denial of his Rule 29.15 motion for post-conviction relief following an evidentiary hearing. Mr. Aaron was convicted of second degree murder, § 565.021.1, RSMo 2000,[1] and armed criminal action, § 571.015. He was sentenced on each count to a twenty-seven year prison sentence, and the court ordered that the sentences run concurrently.

---

1. All statutory references are to Revised Statutes of Missouri 2000, unless otherwise indicated.

On appeal,[2] Mr. Aaron claims that his trial counsel was ineffective for not adequately preparing the defense's mental health experts to testify on the element of intent and for not conducting redirect examination of these experts; for failing to object to the State's cross-examination of one of the defense's mental health experts and Mr. Aaron because the cross-examination drew attention to Mr. Aaron's post-arrest silence; and for failing to object when the State's closing argument equated manslaughter with drunk driving. He also claims that his appellate counsel was ineffective for failing to brief as plain error his claim that the State's cross-examination of one of the defense's mental health experts and Mr. Aaron drew attention to Mr. Aaron's post-arrest silence and his claim that the State's closing argument that equated a manslaughter conviction with drunk driving was improper; and for failing to file a motion to transfer to the Supreme Court because the failure to do so may preclude Mr. Aaron from seeking federal habeas corpus relief.

This court holds that (1) trial counsel's overall performance was that of a reasonably competent attorney with respect to his preparation of the defense's mental health experts and his decision not to conduct redirect examination of them and Mr. Aaron was not prejudiced by his representation; (2) objections based upon improper references to Mr. Aaron's post-arrest silence would not have been meritorious; (3) trial counsel's failure to object to State's closing argument equating manslaughter to drunken driving was reasonable trial strategy and no prejudice resulted; (4) Mr. Aaron's allegations of plain error would not have been successful on appeal, so Mr. Aaron suffered no prejudice from

appellate counsel's failure to raise them; and (5) a motion to transfer to the Supreme Court was not required to preserve Mr. Aaron's right to seek federal habeas corpus relief, so his appellate counsel acted as a reasonably competent attorney and Mr. Aaron suffered no prejudice from appellate counsel's failure to file a motion to transfer. Accordingly, this court finds that the motion court's findings of fact and conclusions of law were not clearly erroneous. The judgment of the motion court denying Mr. Aaron's Rule 29.15 motion is affirmed.

### Factual and Procedural Background

The facts are taken from this court's opinion in *State v. Aaron*, 985 S.W.2d 434, 435 (Mo.App.1999), without citation. On January 3, 1996, Mr. Aaron shot and killed his girlfriend of seven years, Brenda Robinson. Prior to the shooting, Mr. Aaron repeatedly accused the victim of having an affair with his nephew and had threatened to kill her. She moved out of his residence about a week before her death, but they were in the process of reconciling. On the day of the shooting, she went to his convenience store after work to help him run the store and to take inventory.

Mr. Aaron had spent the day with Ms. Robinson's brother drinking, smoking marijuana, and making threats to kill Ms. Robinson. Just before the shooting, he waited on a customer with his hand hidden behind his back. The customer did not see what Mr. Aaron had behind his back, but she did see Ms. Robinson on the phone and noticed that she looked scared and was crying. After the customer walked out of the store, she heard shots, as did the person who was on the phone with Ms. Robinson. The police arrived and found

**2.** For clarity's sake, this court has reordered Mr. Aaron's points to address his ineffective assistance of trial counsel claims before addressing his ineffective assistance of appellate counsel claims.

Ms. Robinson dead and Mr. Aaron shot and injured. When the police asked Mr. Aaron who had shot him, he indicated he had shot himself by pointing to his own head and nodding. When asked who had shot Ms. Robinson, Mr. Aaron again pointed to his own head and nodded.

Mr. Aaron fired three shots at Ms. Robinson. The police found one spent bullet and three shell casings at the scene that had been fired from a .40 caliber gun. The police also found a .40 caliber gun at the scene. The State's pathologist testified that Ms. Robinson's death was caused by multiple gunshot wounds caused by three gunshots, any of which could have been fatal.

The defense at trial was diminished capacity that precluded the intent of "knowingly," and defense counsel offered testimony from Mr. Aaron's treating psychiatrist, Dr. Manuel Pardo, that Mr. Aaron acted on impulse under tremendous anger. Another psychiatrist, Dr. William Logan, testified as an expert witness that Mr. Aaron did not have the capacity to form the intent for second-degree murder because, at the time of the shooting, he could not think rationally.

The jury convicted Mr. Aaron of second degree murder and armed criminal action. The court sentenced Mr. Aaron to twenty-seven years imprisonment on both counts. The court ordered that the sentences run concurrently. Mr. Aaron filed a direct appeal, and this court affirmed the judgment and sentence in *Aaron*, 985 S.W.2d at 437. Mr. Aaron then filed a Rule 29.15 motion for post-conviction relief. Following an evidentiary hearing, the motion court issued findings of fact and conclusions of law denying Mr. Aaron's motion. This appeal followed.

## Standard of Review

■ In reviewing a denial of a motion for post-conviction relief, this court is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). Such a finding will be made only if, after a review of the entire record, the appellate court is left with a "definite and firm impression that a mistake has been made." *Id.*

■ To prevail on his claims of ineffective assistance of trial counsel, Mr. Aaron must meet the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, he must show (1) that his attorney failed to exercise the level of skill and diligence that a reasonably competent attorney would in a similar situation, and (2) that he was prejudiced by that failure. *Id.* at 687, 104 S.Ct. at 2064. Mr. Aaron must meet both prongs of *Strickland*, or the claim of ineffective assistance fails. *Luster v. State*, 10 S.W.3d 205, 210 (Mo. App.2000). To establish the performance prong, Mr. Aaron " 'must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment.' " *Id.* (quoting *State v. Simmons*, 955 S.W.2d 729, 746 (Mo. banc 1997)). This court will look at counsel's overall performance to determine whether counsel's actions "fell short of established acceptable levels of performance." *State v. Brown*, 912 S.W.2d 643, 646 (Mo.App. 1995). To establish prejudice, Mr. Aaron must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Deck v. State*, 68 S.W.3d 418, 429 (Mo. banc 2002) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674).

## Overall Performance Regarding Experts was Reasonable and Competent

█ In his first point, Mr. Aaron claims that his trial counsel was ineffective for failing to adequately prepare the defense's mental health experts, Dr. Logan and Dr. Pardo, to testify regarding whether Mr. Aaron acted knowingly when he shot Ms. Robinson. He further claims that his trial counsel was also ineffective for failing to conduct any redirect examination of the psychiatrists to rebut the State's damaging cross-examination of them.

The defense theory was that Mr. Aaron did not act knowingly when he shot Ms. Robinson.[3] Section 565.021.1(1) provides that a person commits the crime of second degree murder if the person, *inter alia,* "knowingly causes the death of another person." "Knowingly" is defined in § 562.016.3, which states:

A person "acts knowingly", or with knowledge,

(1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or

(2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.

The definition of "knowingly" in the second subparagraph is the definition applicable to the crime of second degree murder, and that element of the offense was submitted to the jury in an instruction requiring the jury to find "that [Mr. Aaron] knew or was aware that his conduct was practically certain to cause the death of Brenda Robinson."

Mr. Aaron called psychiatrists, Dr. Logan and Dr. Pardo, to support his defense by testifying as to Mr. Aaron's mental state at the time of the shooting. During direct examination, Dr. Logan offered this opinion:

A. My opinion is that [Mr. Aaron] was in a lot of emotional distress and turmoil, that he was not thinking rationally at the time, that he was obsessed with this, and that under those conditions, he was not able to use appropriate judgment about what he did.

Q. And do you believe that he had the capacity to form the intent for the crime of which he is charged?

A. He may have had the capacity for it, but at the time he was so distressed and apparently so ruminating about what had happened, it's very unlikely he had the capacity when most of this occurred that he could think rationally about all of this.

On cross-examination, the State asked Dr. Logan more detailed questions regarding his opinion of Mr. Aaron's mental state in comparison to the intent required for second degree murder:

Q. Now, you have expressed certain conclusions here today regarding your evaluation of Mr. Aaron. And the first one, if I understand you, is it your testimony that Mr. Aaron did not have the intent to commit the crime for which he is charged? Is that your testimony?

A. No. Obviously, anybody that shoots somebody and shoots themselves I suppose in a very simple way intended to take out a gun and do that; but it also involves some ability to reflect rationally on what you intend to do.

---

**3.** Section 552.015.2, RSMo 1996, provides that "[e]vidence that the defendant did or did not suffer from a mental disease or defect shall be admissible in a criminal proceeding

... (8) To prove that the defendant did or did not have a state of mind which is an element of the offense."

Q. That's not my question. I believe your testimony was he did not have the intent to commit the crime that has been charged. Now, is that your testimony?

A. That's not my testimony it's accidental, no.

Q. Do you know what he's been charged with?

A. Second degree murder.

Q. Do you know the intent required for second degree murder?

A. My impression is it's kind of a spur of the moment type of offense.

Q. That's your impression?

A. Yes.

Q. Have you ever looked at the law or what it says regarding what it requires?

A. Right. I don't have it memorized, but I have looked at it, yes.

Q. Let me just ask you this question: Do you think that Mr. Aaron, when he locked these doors, took out a gun, and fired three shots into Brenda Robinson who was unarmed and helpless, that he knew at that time or was aware at that time that his conduct was practically certain to cause her death?

A. I'm sure he was suicidal and homicidal at that time, yes.

Q. So your answer is yes?

A. Sure. I think he intended to kill himself and kill her.

Mr. Aaron's trial counsel did not conduct any redirect examination of Dr. Logan.

At the evidentiary hearing on Mr. Aaron's Rule 29.15 motion, Dr. Logan testified that Mr. Aaron's trial counsel met with him four days before trial for one-half hour to prepare for his testimony. Dr. Logan could not remember what he and Mr. Aaron's trial counsel discussed at that meeting, and Dr. Logan could not remember whether he was aware that the mental state for second degree murder was know-

ingly. Dr. Logan testified that, had Mr. Aaron's counsel conducted redirect examination, he would have clarified his testimony by saying "that Mr. Aaron was not in control of his mental faculties; that in fact they were controlled by his depressed state of mind at the time which caused him to be pessimistic, hopeless, paranoid and not to be able to consider things in a rational manner." When asked whether he would have testified to a reasonable degree of medical certainty that Mr. Aaron did not act knowingly when he killed Ms. Robinson, Dr. Logan replied, "To the extent that knowingly includes rational awareness of the nature and consequences of your actions, I could testify that he did not act knowingly."

During cross-examination at the evidentiary hearing, Dr. Logan stated that he testified as an expert witness approximately twenty or twenty-five times a year. He also testified that he was aware of the intent required for second degree murder, even though he could not recite it word for word. The prosecutor then asked Dr. Logan several questions concerning his present opinion of Mr. Aaron's mental state, compared to the opinion Dr. Logan offered at trial:

Q. And you also testified in your medical opinion in this trial, even before rethinking the definition of the word knowingly, you didn't feel the Defendant rationally thought through his actions on the day of the shooting, correct?

A. Yes.

Q. And is that still your opinion to this day?

A. Yes.

Q. And that was shared with the jury in the trial?

A. Yes, it was.

Q. And the question that is tripping us up today is just a question of whether the Defendant knew or was aware that

his actions were likely to result in the death of Brenda Robinson, correct?

A. Yes. In the sense that, in reading the legal definition, that it requires an awareness of the nature of what you're doing and the consequences of it. That's what caused me to amplify my testimony, that due to his depression and his thinking that controlled his thought patterns at the time, he was not able to rationally appreciate at least the nature and consequences of what he was doing.

Q. So if we accept the Defendant's definition of what knowingly is, then your answer would change, correct?

A. I don't understand. I'm sorry. I'm reading what I read in the legal statute.

Q. Which was provided to you by the Movant's counsel in this case, correct?

A. Right. Although, I read it myself. He didn't provide a definition for me.

Q. I understand. But your testimony is now changing based on that, correct?

A. Based on my reading in here what the legal definition of knowingly or what's included in that definition.

Q. Okay. The jury instructions in this case, are you aware or have you reviewed the jury instructions in this case?

A. I was given a copy of jury instructions. I assumed they were the jury instructions in this case, but I don't know that for a fact.

Q. Are you aware that the element that the jury had to find was just the Defendant knew or was aware that his actions were likely to result in the death of Brenda Robinson, correct?

A. Right.

Q. And if you define knowingly in a very concrete sense like you did before, you would come up with the same answer you gave at trial, wouldn't you?

A. Yes.

In addition to Dr. Logan, Mr. Aaron called his treating psychiatrist, Dr. Pardo, to support his defense that he did not act knowingly when he shot Ms. Robinson. At trial, on direct examination, Dr. Pardo testified that his opinion was that "this thing happened on an impulse under tremendous anger. And under this [sic] inhibiting effects of alcohol, that he did not have enough mental capacity to rationally plan or think about the act. In my opinion, it was a quick impulse, based on anger." On cross-examination, he testified that he was not sure whether Mr. Aaron knowingly caused Ms. Robinson's death:

Q. Finally, you're not testifying today that Mr. Ralph Aaron didn't know or was aware that his conduct was practically certain to cause her death? You're not saying that, are you?

A. No, sir, I'm not.

Q. Certainly when he pulled the gun and began firing repeatedly, he knew that his conduct was probably or practically certain rather to cause her death, did he not?

A. Well, I'm not in a position to determine that. I certainly do not know that for a fact.

. . .

Q. [A]re you saying that he did not know that his conduct was practically certain to cause her death?

. . .

A. No. I'm not absolutely positive about that.

At the evidentiary hearing on Mr. Aaron's Rule 29.15 motion, Dr. Pardo testified that Mr. Aaron's counsel met with him a week or two before trial for no more than thirty minutes. Dr. Pardo also testified that based upon the materials Mr. Aaron's post-conviction counsel provided him after the trial, he now had an opinion, to a reasonable degree of scientific certainty,

regarding whether Mr. Aaron acted knowingly when he shot Ms. Robinson:

A. It is my opinion that he did not knowingly proceed in such a manner as to know that the right decision he wanted to make was to go ahead and kill her. He was very ambivalent, torn up between love and hate, and I think that was the state of mind he was in right up to the moment that he went ahead and pulled the trigger. Upon realizing what he had done, he felt so bad that he tried to kill himself.

Mr. Aaron's trial counsel testified at the evidentiary hearing that he met with Drs. Logan and Pardo on separate occasions prior to trial to discuss their opinions. According to trial counsel, he took his MAI book with him to those meetings to go over the elements of second degree murder, but he could not remember whether he gave them copies of the second degree murder instruction or whether he showed them the statutory definition of "knowingly." Trial counsel did, however, specifically remember discussing the elements of second degree murder with Dr. Logan, and that Dr. Logan "absolutely had the instruction" for second degree murder. Trial counsel testified that he met with both doctors again just before they testified. Trial counsel testified that he was confident that Dr. Logan and Dr. Pardo were advised of the "knowingly" standard of intent and were prepared to testify about it, since the purpose of their testimony was to negate that element. As for his reason for not conducting any redirect examination of Dr. Pardo or Dr. Logan, trial counsel testified:

A. You know, you have asked me that question, and I don't remember at this time this specific case. I just know that my feeling in practicing as a defense counsel is that if I don't believe that the witness has been hurt or damaged to the extent that I believe that I need to redirect, I don't. So my belief is that that's what I would have thought. But to say specifically today that I could say I thought that, I can't.

In its findings of fact and conclusions of law denying Mr. Aaron's Rule 29.15 motion, the court found that Mr. Aaron's trial counsel did utilize the MAI book in his conferences with Dr. Logan and Dr. Pardo. The court went on to state, "While clearly the better practice would have been to utilize the statute defining 'knowingly' in preparing these experts for trial, the Court cannot find from the totality of all the circumstances that counsel's conduct in preparing these witnesses rises to the level of ineffective assistance of counsel." In reaching this conclusion, the court stated that Mr. Aaron's trial counsel argued the diminished capacity issue to the jury in his closing argument. The court held that "a review of counsel's overall trial tactics and his closing arguments demonstrate the *Strickland* level of prejudice is simply not met in this case."

The motion court's findings of fact and conclusions of law were not clearly erroneous. The motion court was entitled to believe trial counsel's testimony that, using the MAI book, he discussed the elements of second degree murder with Dr. Logan and Dr. Pardo. *See Kenney v. State,* 46 S.W.3d 123, 128 (Mo.App.2001). Dr. Logan, an experienced expert witness, acknowledged that he was aware of the intent required for second degree murder when he testified at trial, and the opinion he offered at the evidentiary hearing regarding Mr. Aaron's mental state was substantively similar to the opinion he offered during the trial.

■ The trial court found that "the better practice would have been to utilize the statutory definition of 'knowingly' " in preparing the experts for trial. This court does not totally agree because the alterna-

tive definitions of "knowingly" in the statute could be confusing to experts, as shown by the psychiatrists' testimony at the motion hearing. The better practice would have been to educate the expert witnesses of the fact that there are alternative definitions of "knowingly" in § 562.016.3, and that the applicable definition to the offense of second degree murder is the definition in subparagraph (2). And the better practice would have been also to educate the expert witnesses of the fact that this definition controls to the exclusion of the definition in subparagraph (1) and the provision in § 552.030.1, RSMo 1994, that "[a] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he was incapable of knowing and appreciating the nature, quality or wrongfulness of his conduct." [4]

■ Nevertheless, Mr. Aaron has failed to demonstrate that he was prejudiced by trial counsel's failure to educate Dr. Logan and Dr. Pardo on the correct statutory definition of "knowingly," or trial counsel's failure to conduct redirect examination of these experts. Mr. Aaron concedes on appeal that the only reasonable defense available to him under the circumstances in which he killed Ms. Robinson was that he did not possess the mental state of "knowingly." Mr. Aaron contends, however, that he suffered prejudice because the experts would have given more favorable opinions if properly prepared or, at least, could have clarified their opinions if questioned on redirect. The testimony of the expert witnesses at the motion hearing does not support that claim. The "more

favorable" opinions expressed by the psychiatrists when question by Mr. Aaron's counsel at the hearing on his post-conviction motion are based on incorrect definitions of "knowingly."

Dr. Logan incorporated into his definition of "knowingly" the concept that "knowingly includes rational awareness of the nature and consequences" of Mr. Aaron's actions. Dr. Pardo also utilized an incorrect definition of "knowingly" when he expressed his opinion that Mr. Aaron "did not knowingly proceed in such a manner as to know that the right decision he wanted to make was to go ahead and kill her.... The moment the act finally happened, I think his thought process was clouded by the passion, more specifically, the anger state that he was in and the disinhibiting effect of alcohol, plus being in a depressed state, I think all of those set of circumstances did affect his decision making process." Neither expert expressed an opinion favorable to Mr. Aaron that related to the correct definition of "knowingly," whether Mr. Aaron knew or was aware that his conduct was practically certain to cause the death of Ms. Robinson. Any testimony that was based upon a misapplication of the definition of "knowingly" would not have aided Mr. Aaron at trial, since the prosecutor's cross-examination focused upon the correct definition.

In addition, the trial transcript shows that Mr. Aaron's trial counsel attempted to clarify Dr. Logan's and Dr. Pardo's opinions and relate them to the definition of "knowingly" in his closing argument:

4. Section 552.030.1, RSMo 1994, provides for the defense of not guilty by reason of mental disease or defect, and is admissible only if the defendant enters such a plea or provides written notice of his intent to rely on it as a defense, and the procedures contained in § 552.030 are then followed. The record

does not indicate that Mr. Aaron entered such a plea or filed written notice of his intent to rely on such a defense. Therefore, § 552.030.1's definition of mental disease or defect excluding responsibility was not applicable to Mr. Aaron.

There was psychosis. The man was depressed. He had depression that had gone back earlier in his life that he had never ever dealt with.

Then he thought, which most people do, that by taking alcohol, that that would somehow make you calm. And the problem is, it makes you calm, but it deepens the depression.

Then, with a man in deep depression who is then confronted with what he believes, even though it may end up being untrue, that Brenda has been unfaithful, then sends him into this "snapped" is the word Dr. Pardo used. "Explode" is the word Dr. Logan used.

. . .

[Dr. Logan and Dr. Pardo's] opinions are their professional opinions that they give every day no matter who is talking to them, because their credibility has to count from case to case. They're sure not going to sell themselves to Ralph Aaron after this guy had testified over 100 different times and somehow now he's going to get in bed with Ralph Aaron to help him out of his troubles.

Because on cross examination, he wasn't so strong about what he said as it relates to the elements that [the State] definitely asked him whether or not he intended the conduct.

Sure. Whenever you shoot someone, you obviously intend the natural conduct of what's going to happen. The question is: Do you knowingly do it? Do you know what you're doing at the time? Or has the mental aspect of this, the depression at the time caused you to act irrationally?

You heard him talk about his compulsive-obsessive irrational thinking, that both doctors use different words. One said "snapped" and one said "exploded." It all exploded at one time.

In determining effectiveness, this court looks to counsel's overall performance. *Brown*, 912 S.W.2d at 646. Mr. Aaron's trial counsel utilized the only reasonable defense available to him under the circumstances of the crime, that Mr. Aaron did not have the mental state of "knowingly" when he killed Ms. Robinson. From the testimony of the expert witnesses at trial and at the motion hearing, and Mr. Aaron's failure to present the expert opinion of any other witness, it is clear that Mr. Aaron's trial counsel presented that defense as best he could. While the expert witnesses were unable to expressly state under the correct standard that Mr. Aaron lacked the necessary intent, Mr. Aaron's trial counsel used their testimony to try to create reasonable doubt as to whether Mr. Aaron was guilty. His closing argument also utilized the opinions of Dr. Logan and Dr. Pardo to raise doubt as to the element of "knowingly." Thus, trial counsel's overall performance was that of a reasonably competent attorney with respect to his preparation of Dr. Logan and Dr. Pardo and his decision not to conduct redirect examination, and Mr. Aaron fails to demonstrate that he suffered prejudice. Therefore, the motion court did not clearly err in denying Mr. Aaron's Rule 29.15 motion on this basis. This point is denied.

### Post–Arrest Silence Objections Would Have Been Non–Meritorious

Mr. Aaron next contends that he received ineffective assistance of counsel because his counsel did not object to questions the State asked during cross-examination of Dr. Pardo and him. Mr. Aaron claims that the State's comments violated his right not to have his post-arrest silence used against him.

During cross-examination of Dr. Pardo, the State questioned him about reports from psychologists at the VA Hospital who

treated Mr. Aaron a month after the shooting, prior to the time when Dr. Pardo began treating Mr. Aaron. Specifically, the State questioned Dr. Pardo regarding whether he was aware that Mr. Aaron indicated to a psychology intern at the VA Hospital that the reason he was seeking psychological treatment was because he was angry about not receiving disability benefits from the VA system, and he did not want to discuss the circumstances surrounding the shooting:

Q. And at that time, did [the psychology intern's report] go on to say: "This patient indicated that he does not wish to discuss any of the events or issues surrounding his current legal problems, including his feelings of loss for his wife, the shooting itself, or problems leading up to the shooting." Did I read that accurately?

A. That is correct, yes, sir.

Later, during cross-examination of Mr. Aaron, the State asked him about a conversation he had with the police after the shooting:

Q. When the police came and they asked you if you were the person who did this, you pointed to yourself, didn't you?

A. I don't remember.

Q. Do you remember when you first went to the hospital and you told them that at that time you didn't even want to talk about the case or what you had done?

A. No.

[Defense counsel]: Which hospital, [prosecutor]?

[Prosecutor]: Research hospital.

Q. Do you remember that?

A. No.

In denying Mr. Aaron's ineffective assistance of counsel claim, the motion court found that trial counsel's decision not to object to these questions to Dr. Pardo and Mr. Aaron was presumed to be trial strategy, and the questions were not improper because Mr. Aaron was not in custody. The motion court also found that because of the nature of the testimony regarding Mr. Aaron's mental state, the scope of the State's cross-examination was proper.

 Mr. Aaron contends that the motion court clearly erred because the State's questions were an improper reference to his post-arrest, post-*Miranda*[5] silence. "In *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that the use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, is fundamentally unfair and violates the due process clause of the Fourteenth Amendment." *State v. Dexter*, 954 S.W.2d 332, 337 (Mo. banc 1997). "The State may not use post-arrest silence either as affirmative proof of the defendant's guilt or to impeach his testimony." *State v. Flynn*, 875 S.W.2d 931, 934 (Mo.App. 1994). "In reviewing a claim of an improper reference to an accused's post-arrest silence, an appellate court must consider the comment in the context of the entire argument." *State v. Rath*, 46 S.W.3d 604, 608 (Mo.App.), *cert. denied*, —— U.S. ——, 122 S.Ct. 469, 151 L.Ed.2d 385 (2001).

 "[E]vidence of a defendant's silence is only disallowed if the defendant was in custody." *State v. Simmons*, 955 S.W.2d 752, 764 (Mo. banc 1997). A person is "in custody" when, under the totality of the circumstances, a reasonable person would believe that his freedom of action is restrained in any significant way. *State v.*

---

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Werner,* 9 S.W.3d 590, 595 (Mo. banc 2000). " 'Custodial interrogation' means 'questioning initiated by law enforcement officers.' " *Id.* (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

The State's question to Dr. Pardo concerned Mr. Aaron's reluctance to talk about the shooting to a psychology intern when Mr. Aaron sought psychiatric treatment at the VA Hospital. Mr. Aaron's silence regarding his participation in the crime was in response to questions from a psychology intern, not a law enforcement officer. Moreover, Mr. Aaron admits in his brief that the counseling sessions during which the questions were asked occurred "long after [Mr. Aaron's] arrest during outpatient counseling sessions," and "[b]y that time, [Mr. Aaron] had been released on bond, had retained counsel, and was awaiting trial." As a result, Mr. Aaron was neither subjected to custodial interrogation nor in custody at the time, so the protection against the use of his post-arrest silence does not apply. An objection to Dr. Pardo's testimony on this basis would have been overruled. Trial counsel is not ineffective for failing to make a non-meritorious objection. *State v. Clay,* 975 S.W.2d 121, 135 (Mo. banc 1998). Therefore, this court finds that trial counsel was not ineffective for failing to object to the State's question to Dr. Pardo.

■ With respect to the question to Mr. Aaron, it is unclear from the record whether Mr. Aaron was "in custody" when, during his hospitalization for his self-inflicted gunshot wound, he told the police that he did not want to talk about the case or what he had done. Even if he was "in custody," however, the prosecutor's question, when viewed in its context, was not a comment on Mr. Aaron's post-arrest silence.

During Mr. Aaron's direct examination testimony, he testified that, while he remembered Ms. Robinson counting cigarettes and talking on the phone, he could not remember anything after that point because he just "lost it." According to Mr. Aaron, he "just snapped or something," and the next thing he remembered, he woke up in the hospital. Mr. Aaron testified that the first time he learned what he had done to Ms. Robinson was when his brother came to the hospital four or five days after the shooting and told him about the incident.

The cross-examination question which Mr. Aaron now alleges was improper occurred when the State asked Mr. Aaron a series of questions regarding his memory of events before, during and after the shooting:

Q. But this period of time when you actually almost point-blank range fired three shots into this unarmed defenseless woman, you don't remember any of that, is that right?

A. No.

Q. When the police came and they asked you if you were the person who did this, you pointed to yourself, didn't you?

A. I don't remember.

Q. Do you remember when you first went to the hospital and you told them that at that time you didn't even want to talk about the case or what you had done?

A. No.

[Defense counsel]: Which hospital, [prosecutor]?

[Prosecutor]: Research hospital.

Q. Do you remember that?

A. No.

Q. Before this happened, did you suffer from depression?

A. I don't know.

Q. Would you say you had a drinking problem before this happened?

A. I don't think so.

Q. Was there ever any times that you couldn't go to work, do your job, because you felt depressed?

A. No.

Q. But you were seriously depressed after you found out what you had done in the hospital; is that correct?

A. Yes.

Q. And this treatment for the depression and all that all started after you found out you had not only committed this crime but now were going to have to face the consequences; isn't that fair, sir?

A. No.

Q. That's the first time you actually received any medicine or counseling; isn't that correct?

A. Yes.

Q. And what you're telling us today is that you don't remember the horrific scene that you left there at the time you then tried to kill yourself; is that what you're telling us?

A. Yes.

The purpose of this line of questioning was to refute Mr. Aaron's testimony that he "just snapped" prior to shooting Ms. Robinson and was unaware of what he had done until his brother told him about it four or five days later. The question concerning whether he remembered telling the police, when he was first taken to the hospital, that he did not want to talk about the case or what he had done, was not a direct comment on Mr. Aaron's post-arrest silence but, rather, was proper to rebut Mr. Aaron's testimony that he did not

remember anything until his brother came to the hospital four or five days after the incident and told him what had happened. *See State v. Petty*, 967 S.W.2d 127, 142 (Mo.App.1998) (stating that "[w]hen a defendant has injected an issue into the case, the state may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by this issue.").

Moreover, Mr. Aaron has not demonstrated any prejudice from the prosecutor's question. In *State v. Riley*, 901 S.W.2d 92, 95 (Mo.App.1995), the court found that there was no plain error when the court allowed proof of the defendant's post-arrest silence.[6] In reaching that conclusion, the *Riley* court stated, "Defendant's post-arrest silence came into evidence in a casual way, and the prosecutor made no attempt to make anything of it. He did not mention it in his jury argument. Significant prejudice to defendant is unlikely." *Id.*

Here, the prosecutor's question, which only alluded to Mr. Aaron's post-arrest silence, arose in the context of what Mr. Aaron remembered after shooting Ms. Robinson. This is not a case where the prosecutor used Mr. Aaron's post-arrest silence to prove that Mr. Aaron was sane. *See State v. Zindel*, 918 S.W.2d 239, 243 (Mo. banc 1996) (key element in State's case was that defendant's assertion of right to remain silent was evidence that defendant was sane at the time of the crime was committed). The State did not dwell on whether Mr. Aaron invoked his right to remain silent, nor did it mention it in its closing argument. Based upon the context of the questions to Mr. Aaron, trial counsel's failure to object did not prejudice

---

**6.** This court recognizes that the *Strickland* prejudice standard and the prejudice standard on plain error review are different. *See Deck*, 68 S.W.3d at 425–429. The factors that

the *Riley* court considered in finding no plain error, however, are instructive in this court's determination of whether Mr. Aaron was prejudiced under the *Strickland* standard.

Mr. Aaron. Therefore, the motion court did not clearly err in denying Mr. Aaron's Rule 29.15 motion on this basis. This point is denied.

### Failure to Object to State's Closing Argument was Reasonable Trial Strategy and No Prejudice Resulted

In his next point, Mr. Aaron claims that his trial counsel was ineffective for not objecting to this portion of the State's closing argument:

> I have a case where an individual threatens to kill a woman. He then locks her in his store. He then shoots her, not once, not twice, but three times as she tries to escape into the storeroom, and we want to let it be called manslaughter, that this is somehow a drunken driving case.

Mr. Aaron contends the prosecutor's comment equating manslaughter with drunk driving denied him a fair trial. He argues that had his trial counsel objected to this argument, the court would have sustained the objection and either given an instruction to disregard the State's comment or granted a mistrial. Mr. Aaron does not cite any authority with similar facts for this proposition. He merely states that "[w]ell-established case law precludes prosecutors from injecting such extraneous and prejudicial factors into the deliberations during their summation."

"Objections during closing argument are considered a function of trial strategy." *State v. Hall*, 982 S.W.2d 675, 689 (Mo. banc 1998). Trial counsel will be deemed ineffective for failing to object during closing argument only if the argument prejudiced the defendant and resulted in substantial deprivation of the defendant's right to a fair trial. *Olds v. State*, 891 S.W.2d 486, 491–92 (Mo.App.1994). "[T]he alleged improper argument must be considered in the context of the trial as a whole." *Hall v. State*, 16 S.W.3d 582, 586 (Mo. banc 2000).

In its findings of fact and conclusions of law, the motion court found that trial counsel's failure to object to the prosecutor's comment was part of his overall strategy. The evidence supports this finding. At the evidentiary hearing, Mr. Aaron's trial counsel testified that he did not specifically remember this argument, and that he would not disagree that it was improper. Nevertheless, he testified that he recalled that when the prosecutor made this argument, the prosecutor said it "in a very sarcastic and kooky way." Mr. Aaron's trial counsel thought that "it was kind of a ridiculous argument," and he testified that the reason he did not object to the argument was because he did not believe the argument helped the State.

Additionally, the motion court determined that the prosecutor's comment was proper retaliatory argument in light of the defense's closing argument. The record supports this finding. The court instructed the jury on second degree murder, voluntary manslaughter, involuntary manslaughter, and armed criminal action. In closing argument, Mr. Aaron's trial counsel made the following argument against convicting Mr. Aaron of second degree murder, voluntary manslaughter, or armed criminal action:

> We know that now, since he got help and he's on medication, he has been somewhat cured. So this is a different Ralph Aaron. This is a cured Ralph Aaron so to speak.
>
> But now to take him and put him in prison for the rest of his life, give him voluntary manslaughter, put him in prison for 15 years or three to life on the armed criminal action, what will that accomplish? What will that do in the light of this case?

The crux of the defense's argument was that because Mr. Aaron was cured, a conviction for second degree murder, which carries a possible life sentence, a conviction for voluntary manslaughter, which carries a possible fifteen-year sentence, or a conviction for armed criminal action, which carries a possible three years to life sentence, would accomplish nothing. Therefore, defense counsel was essentially arguing to the jury that it should find Mr. Aaron guilty of the lesser included offense of involuntary manslaughter, which provides for the possibility of no prison term, or find him not guilty.

The prosecutor's argument in response was that Mr. Aaron's actions of previously threatening to kill Ms. Robinson, locking her in the store, and shooting her three times as she tried to escape, merited more than a involuntary manslaughter conviction, as causing the death of someone while driving drunk is a form of manslaughter.[7] The prosecutor's argument that these facts warranted a harsher conviction than involuntary manslaughter was in retaliation to defense counsel's argument that Mr. Aaron's cured condition warranted an involuntary manslaughter conviction or a not guilty verdict. While the specific reference to drunk driving was irrelevant, "[a] prosecutor has considerable leeway to make retaliatory arguments at closing," *State v. Parker*, 886 S.W.2d 908, 922 (Mo. banc 1994), and is permitted to retaliate to an argument made by the defense "even if the prosecutor's comment would be improper." *State v. Walls*, 744 S.W.2d 791, 798 (Mo. banc 1988). The motion court indicated that had trial counsel objected to this argument, the objection would not have been meritorious.

Counsel will not be found ineffective for failing to make non-meritorious objections. *Clay*, 975 S.W.2d at 135. Thus, the motion court did not clearly err in denying Mr. Aaron's Rule 29.15 motion on this basis. This point is denied.

### Alleged Errors Would Not Have Required Reversal On Appeal

In his next point, Mr. Aaron claims that the motion court clearly erred in denying his Rule 29.15 motion because his appellate counsel was ineffective in that she did not brief as plain error: a claim that during cross-examination of Dr. Pardo and Mr. Aaron, the State drew attention to Mr. Aaron's post-arrest silence; and a claim that the State's comment closing argument equating a manslaughter conviction with drunk driving denied Mr. Aaron a fair trial.

To succeed on an ineffective assistance of appellate counsel claim, "strong grounds must exist showing that counsel failed to assert a claim of error which would have required reversal had it been asserted on appeal and which was so obvious from the record that a competent and effective lawyer would have recognized it and asserted it." *Hall*, 16 S.W.3d at 587.

This court has determined that the State's cross-examination of Dr. Pardo and Mr. Aaron did not improperly refer to Mr. Aaron's post-arrest silence, and did not prejudice Mr. Aaron. Likewise, this court has determined that the State's comment in its closing argument regarding manslaughter was proper retaliation to defense counsel's closing argument. Since neither of the alleged errors would have required reversal had they been asserted as matters

---

7. Section 565.024.1(2) provides that "[a] person commits the crime of involuntary manslaughter if he ... (2) While in an intoxicated condition operates a motor vehicle in this state and, when so operating, acts with criminal negligence to cause the death of any person."

of plain error on appeal, the motion court did not clearly err in denying Mr. Aaron's ineffective assistance of appellate counsel on this basis. This point is denied.

### Motion to Transfer Not Required to Seek Habeas Corpus Relief

█ Finally, Mr. Aaron claims that his appellate counsel was ineffective for failing to file a motion to transfer the case to the Supreme Court after his direct appeal was denied. Mr. Aaron argues that the United States Supreme Court decision of *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), holds that a criminal defendant does not exhaust his state remedies if he fails to file a motion to transfer to the state supreme court. Therefore, Mr. Aaron contends that appellate counsel's failure to file a motion to transfer may procedurally bar him from seeking federal habeas corpus relief.

The United States Supreme Court granted certiorari in *O'Sullivan* while Mr. Aaron's direct appeal was pending. The issue in *O'Sullivan* was whether a federal habeas corpus petitioner must file a motion for review in the highest court of a state to exhaust his state remedies. *Id.* at 842–43, 119 S.Ct. at 1731. Mr. Aaron's post-conviction counsel informed his direct appeal counsel of the *O'Sullivan* case, but Mr. Aaron's appellate counsel did not file a motion to transfer to the Supreme Court. This court decided Mr. Aaron's direct appeal on February 23, 1999. On June 7, 1999, the United States Supreme Court handed down *O'Sullivan*. In *O'Sullivan*, the Court held that prisoners who are seeking federal habeas corpus relief are required "to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State." *Id.* at 847, 119 S.Ct. at 1733.

After *O'Sullivan* was decided, the Eighth Circuit Court of Appeals, in *Dixon*

*v. Dormire*, 263 F.3d 774, 780–81 (8th Cir. 2001), determined that Missouri prisoners who bypassed the opportunity to apply for discretionary review before *O'Sullivan* was decided did not have to file a motion to transfer to the Supreme Court to exhaust their state remedies. *Id.* at 781–82. Mr. Aaron admits that under *Dixon* he did not have to file a motion to transfer to exhaust his state remedies. He contends that the United States Supreme Court may overturn *Dixon*, and, therefore, he would not be able to seek federal habeas corpus review. The Eighth Circuit decided not to rehear *Dixon* en banc, and the United States Supreme Court has not indicated whether it will review *Dixon*. Further, on October 23, 2001, the Missouri Supreme Court amended Rule 83.04 to include the sentence, "Transfer by this Court is an extraordinary remedy that is not part of the standard review process for purposes of federal habeas corpus review."

The law at this time does not require that a defendant file a motion to transfer to exhaust state remedies. This court will not speculate that the law may change to Mr. Aaron's disadvantage at some point in the future. Because Mr. Aaron suffered no prejudice from his appellate counsel's failure to file a motion for transfer, in light of *Dixon*, Mr. Aaron has failed to demonstrate prejudice. The motion court did not clearly err in denying Mr. Aaron's Rule 29.15 motion on this basis. This point is denied.

The judgment of the motion court is affirmed.

All concur.