**STATE of Missouri, Respondent,**

v.

**Ray R. STEGER, Appellant.**

**No. ED 86872.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Nov. 14, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 14, 2006.

1. All statutory references are to RSMo.2000, unless otherwise indicated.

Michael A. Gross, St. Louis, MO, Albert C. Lowes, Cape Girardeau, MO, for appellant.

Shaun J. Mackelprang, Karen L. Kramer, Jefferson City, MO, for respondent.

## OPINION

GEORGE W. DRAPER III, P.J.

Ray Steger (hereinafter, "Steger") appeals from the trial court's judgment after a jury found him guilty of two counts of assault in the first degree, Section 565.050.1 RSMo (2000) [1], two counts of armed criminal action, Section 571.015, and one count of unlawful use of a weapon, Section 571.030. Steger was sentenced to a total of ten years' imprisonment. We reverse and remand for a new trial.

Steger does not challenge the sufficiency of the evidence to support his convictions. The facts in the light most favorable to the verdict are as follows:

Carl Barrett (hereinafter, "Barrett") lives off County Road 304 in Bollinger County at the end of a long driveway. Barrett owns a shop next to his home that he uses for farm machinery repair. Barrett's employee, Michael Towell, (hereinafter, "Towell") and his wife, Kristina (hereinafter, "Kristina") reside in a separate building several hundred yards further back from the road. Steger lives on Rural Route 4 also in Bollinger County.

Steger testified he and his wife lived on a highway that intersects County Road 304, and he used it as a route when going back and forth to work before he retired. Late on the evening of June 11th, Steger decided to stop near Barrett's property because he needed to urinate. Barrett recognized Steger and accused him of trying to steal parts from his shop. Later, Barrett stated he thought Steger was there to visit Kristina. Barrett told Steger to leave, and he did.

Steger testified he thought Barrett's behavior was odd, and he suspected Barrett and Towell were manufacturing methamphetamine. Steger testified he drove past Barrett's house every night between June 11th and June 15th in order to "sniff the air" to determine if he could smell chemicals on Barrett's property. There was

---

1. All further statutory references are to RSMo (2000) unless otherwise indicated.

never any evidence presented to indicate either Barrett or Towell were manufacturing methamphetamine.

Kristina worked at a convenience store in Marble Hill and frequently encountered Steger as one of her customers. Steger would purchase gas and miscellaneous items from the store on an almost daily basis. Kristina testified Steger was very flirtatious with her, and continued to flirt with her even after she informed him that she was married and not interested in him. Steger ignored Kristina's comments, and his actions toward her became more flirtatious and serious. Kristina testified she became uncomfortable with Steger's unwanted attention and even "a little scared." Kristina decided to take legal action and applied for an ex parte order of protection against Steger on June 15, 2004.[2]

On June 15th, Steger testified he was at his "old home place" repairing a fence that was damaged. He stated he took his Glock up there to do some target shooting as well. Additionally, Steger had an old .32 pistol in the glove compartment of his vehicle. When he returned home around 4:30 p.m., Deputy Kevin Otte (hereinafter, "Deputy Otte") served him with the order of protection directing him to stay away from Kristina. Deputy Otte did not tell Steger he had to stay away from Barrett's property. Steger testified he was shocked to receive the order because he thought he was polite and pleasant with Kristina. Steger denied engaging in any of the behavior Kristina alleged, specifically denying touching her or making the sexually explicit comments. Steger also relayed his concerns about Barrett and Towell manufacturing methamphetamine to Deputy

Otte after he was served with the order of protection.

Later that evening, Steger testified he again drove past Barrett's property to determine whether he could smell anything indicating methamphetamine manufacturing. At this point, the parties' versions of events diverge. Steger testified he stopped his vehicle in approximately the same spot as he had on June 11th, when a flash of light caused him to turn his head suddenly. Steger stated, "As I jerked around, there were two more flashes. There was [sic] a total of three shotgun shots fired." Steger grabbed the Glock, held it out the driver's side window, emptied the clip into the air, and "got the heck out of Dodge."

Conversely, Barrett testified he was working in his shop and finished up late in the evening. Barrett walked out of his shop and saw a spotlight shining towards him from a vehicle parked down on the county road. The spotlight blinded Barrett, who was unable to see who was speaking to him from the vehicle. Barrett called out, "Who are you? What do you want?" At that point, Barrett stated two shots were fired and were aimed at him based upon his observation of two "round spots of light." Barrett thought he would have seen "a streak of light" if the shots had been fired in a different direction.

Barrett stated he sought cover in his shop. Barrett could not see the vehicle from the shop, but when he heard a vehicle passing, Barrett looked outside and believed he saw Steger from the light emitted from another passing vehicle's headlights. Barrett contacted the Bollinger County Sheriff's Department and reported Steger had fired shots at him. Barrett

---

2. The Southern District vacated the order of protection on appeal, holding there was insufficient evidence to support its issuance. *Towell v. Steger*, 154 S.W.3d 471 (Mo.App. S.D. 2005). The court held Steger's behavior did not rise to the level of harassment, stalking, or abuse. *Id.* at 476.

also called Towell for assistance. Towell got in his truck, and proceeded down the driveway with an old .12 gauge shotgun loaded with birdshot in his truck. After speaking to Towell, Barrett loaded a shotgun and stepped out of his shop. Barrett stood behind a tree, aimed his shotgun at Steger's head, and told Steger he "had called the law ... and you better leave." Steger left, driving west toward a nearby creek, heading down the road toward Towell's residence.

Meanwhile, Towell testified it was dark when he left his residence to come to Barrett's aid. Towell drove as quickly as he could, but had difficulty with his truck's headlights. Towell testified he saw Steger sitting in his vehicle at the end of their driveway with the dome light on. The passenger side of the vehicle was facing Towell, and the vehicle was approximately forty to fifty yards away. Towell thought he saw Steger reloading a clip. Steger then pointed his pistol out of the passenger side window and fired several shots at Towell. Towell returned fire with his shotgun. Barrett testified he heard additional shots as well.

After hearing gunshots, Kristina called 911 and went to the end of the driveway to check on Towell. In the meantime, Towell saw Steger move across a bridge to the side of the creek just in front of a neighbor's driveway and fire more shots. The neighbor came out and Towell told him Steger was firing shots at him. Towell enlisted the neighbor's help in retrieving the shell casings, but testified he did not move them.

Steger disputes this scenario. He denied having the passenger side window down, turning on the spotlight, driving to another location, or firing additional shots at Towell. Steger denied seeing Towell at all that evening.

Deputy Otte responded to the scene. The police found several shell casings in the area. There were metal casings near the bridge, on the side of the bridge away from the Towell residence, and in front of Barrett's house. A shotgun shell was found near Towell's truck in the driveway.

Deputy Otte, accompanied by Captain Stanley Petton, (hereinafter, "Captain Petton") left the scene to find Steger. After leaving Barrett's property, Steger testified he drove directly to a convenience store where he purchased whiskey and soda to make himself a drink. Steger was at his residence with the police arrived. When Steger came outside, Deputy Otte noticed a smell of intoxicants, but stated Steger was cooperative. When asked what he had been doing that night, Steger responded he "had a little bit to drink and just went riding around." Steger denied having any weapons on his person or in his vehicle. Captain Petton advised Steger of his *Miranda* rights, patted him down, and placed him under arrest.

Deputy Otte searched Steger's vehicle and found a small spotlight sitting on the passenger seat along with a .40 caliber Glock handgun and an empty magazine. The search also revealed a loaded .32 caliber Colt semi-automatic pistol in the glove compartment, three empty .40 caliber shells, and a pint of Canadian whiskey with an inch of alcohol left in it. Steger was placed under arrest and taken to the police station.

At the police station, Deputy Otte wanted to administer a breathalyzer test to Steger. The following exchange occurred during Deputy Otte's testimony during the State's case in chief:

[The State]: All right. Did the breathalyzer machine work properly at the time you ran it?

Deputy Otte: No, it did not work properly at that time.

[The State]: And did the conversation end at that point?

Deputy Otte: Shortly after.

[The State]: I believe he decided he wanted to go ahead and talk to his attorney?

Deputy Otte: Correct.

[The State]: And your procedure is you don't go any further once they do that?

Deputy Otte: Correct.

Captain Petton questioned Steger at the police station as well. In response to the prosecutor's inquiry about statements Steger made at the police station, Captain Petton testified:

What I remember him saying that he wasn't doing anything wrong. He had the right to drive anywhere he wanted to. I asked him why he picked the particular road which he had had an ex parte served on the people that lived on that road. He said it was a free country. He can drive where he wants. Said he was a retired millionaire from Proctor and Gamble. He had no reason to do the things he was up there for. I told him it was a free country. He could drive where he wanted to. It's just shooting at somebody and violating an ex parte at the same time—shooting at somebody and violating an ex parte order at the time was illegal and at that point he stated he wanted to speak to a lawyer.

When asked to explain further the sequence of Captain Petton's questioning, he responded:

He asked me again what he was—after he requested the attorney, requested a lawyer, he asked what he was up there for again. I told him at that time you need to speak to somebody with Bollinger County Sheriff's Department. It wasn't my investigation. He was there,

you know, just under my care at that time.

Steger told the officers Towell fired at him first and that he responded by firing shots in self-defense. Steger did not state Barrett shot at him first.

Steger was charged with two counts of first degree assault, two counts of armed criminal action, and one count of unlawful use of a weapon. The offenses were charged in two separate cases. These cases were consolidated for trial. A jury found Steger guilty on all five charges. Steger waived jury sentencing. The trial court sentenced Steger to ten years' imprisonment for each of the assaults on Barrett and Towell, four years' imprisonment for unlawful use of a weapon, and five years' imprisonment for the armed criminal actions charges related to each assault count. The trial court ordered the sentences to run concurrently. Steger appeals.

 Steger raises three points on appeal. In his first point, Steger argues the trial court plainly erred in allowing the State to adduce evidence that Steger invoked his Sixth Amendment right to counsel during police questioning. Steger claims this evidence violated his due process rights and the right to be free from compulsory self-incrimination.

 Steger concedes this point is not preserved for review. Defense counsel did not object to statements at trial, and it was not included in Steger's motion for new trial. Hence, we review for plain error only. Rule 30.20. This Court only grants relief under the plain error standard when an alleged error "so substantially affect[s] a defendant's rights that a manifest injustice or a miscarriage of justice results if left uncorrected." *State v. Presberry*, 128 S.W.3d 80, 85 (Mo.App. E.D.2003). Plain error is one that is evident, obvious, and

clear. *State v. Mickle,* 164 S.W.3d 33, 58 (Mo.App. W.D.2005). A defendant assumes the burden of proof to demonstrate plain error. *State v. Stewart,* 113 S.W.3d 245, 248 (Mo.App. E.D.2003). The Missouri Supreme Court permits plain error review of this issue, and we choose to undertake plain error review as well. *See State v. Zindel,* 918 S.W.2d 239 (Mo. banc 1996); *State v. Dexter,* 954 S.W.2d 332 (Mo. banc 1997); *State v. Anderson,* 79 S.W.3d 420 (Mo. banc 2002).

Steger argues the State told the jury several times that after having been advised of his *Miranda* rights, Steger decided to stop conversing with the police and decided to exercise his right to remain silent and to contact an attorney. Steger believes this evidence resulted in manifest injustice because the jury was invited to equate Steger's invocation of his constitutional rights with evidence of his guilt.

 In a criminal case, the Fifth Amendment guarantees each person shall be protected from compulsory self-incrimination. *State v. Graves,* 27 S.W.3d 806, 811 (Mo.App. W.D.2000). The privilege against self-incrimination includes the requirement that the police warn those taken into custody that they have the right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Brooks,* 185 S.W.3d 265, 272–73 (Mo.App. W.D.2006). "In *Doyle v. Ohio,* 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that the use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, is fundamentally unfair and violates the due process clause of the Fourteenth Amendment." *Aaron v. State,* 81 S.W.3d 682, 693 (Mo. App. W.D.2002)(*quoting Dexter,* 954 S.W.2d at 337). "This rule rests on the 'fundamental unfairness of implicitly assur-

ing a suspect that his [or her] silence will not be used against him [or her] and then using his [or her] silence to impeach an explanation subsequently offered at trial.' " *Dexter, supra (quoting Wainwright v. Greenfield,* 474 U.S. 284, 291 106 S.Ct. 634, 638–39, 88 L.Ed.2d 623 (1986)).

 Missouri cases hold that if a defendant exercises his or her right to remain silent or request an attorney, it is a fundamental violation of his or her constitutional rights for the State to use that silence against him or her. *Anderson,* 79 S.W.3d at 440–41. Silence includes not only a refusal to speak to the police, but also a request for an attorney. *State v. Nastasio,* 957 S.W.2d 454, 461 (Mo.App. W.D.1997). "The State may not use post-arrest silence either as affirmative proof of the defendant's guilt or to impeach his [or her] testimony." *Aaron,* 81 S.W.3d at 693. However, post-arrest silence evidence may be admissible when "no reasonable inference of guilt can be drawn merely from the fact the defendant was informed of his [or her] rights and then exercised them when he [or she] was not being questioned at the time he [or she] invoked [those] rights." *Anderson,* 79 S.W.3d at 441. "Nonetheless, any evidence describing the conclusion of an interrogation must be carefully scrutinized. Evidence in regard to the conclusion of an interrogation which reveals that the defendant was failing to answer a direct charge of guilt is improper." *State v. Frazier,* 927 S.W.2d 378, 380 (Mo.App. W.D.1996)(*citing State v. Tims,* 865 S.W.2d 881, 886 (Mo.App. E.D.1993)).

 Once we determine a *Doyle* violation has occurred, "this Court has the discretion to review the violation or violations in context of the entire record for plain error that affects substantial rights and constitutes a manifest injustice." *Dexter,* 954 S.W.2d at 340. The paramount concern is whether the inadmissible evidence

had a decisive effect on the jury. *Id.* To determine the effect on the jury, we must determine whether: (1) the government made repeated *Doyle* violations; (2) the trial court issued any curative remedies; (3) the defendant's exculpatory evidence is transparently frivolous, and (4) there is overwhelming evidence of guilt. *Id.*, (*citing Brecht v. Abrahamson*, 507 U.S. 619, 639, 113 S.Ct. 1710, 1722–23, 123 L.Ed.2d 353 (1993); *U.S. v. Wiley*, 29 F.3d 345, 349 (8th Cir.) *cert. denied*, 513 U.S. 1005, 115 S.Ct. 522, 130 L.Ed.2d 427 (1994)); *State v. Storey*, 986 S.W.2d 462, 466 (Mo. banc 1999).

First, the record clearly demonstrates the State made repeated *Doyle* violations. Both police officers testified about Steger's invoking his right to counsel. Deputy Otte discussed it in context with asking Steger to take a breathalyzer test after being arrested. After indicating the breathalyzer machine did not work, Deputy Otte stated his conversation with Steger ended at that point. The prosecutor then asked, "I believe he decided he wanted to go ahead and talk to his attorney?" to which Deputy Otte replied, "Yes."

Further, Captain Petton made two references to Steger requesting an attorney. Captain Petton's testimony was damaging in that it provided an inference of guilt. Captain Petton engaged in a long narrative answer about the conversation he had with Steger at the police station, despite Captain Petton's insistence that he was not the investigating officer. Captain Petton testified when he told Steger, "[S]hooting at somebody and violating an ex parte order at the time was illegal ... at that point he stated he wanted to speak to a lawyer." This testimony was reiterated when Captain Petton was asked to explain further the sequence of his questioning. He prefaced his answer by stating, "He asked me again what he was—after he requested the attorney, requested a lawyer, he asked what he was up there for again."

Second, there were no curative efforts made by the trial court. We recognize defense counsel did not object and failed to seek curative measures. However, "[t]he prosecutor's mere asking of the questions ... had already created an inference of guilt by directing the jury to be suspicious of appellant's lack of a response...." *Dexter*, 954 S.W.2d at 341. Here, the prosecutor elicited three separate comments about Steger's request for an attorney during the case-in-chief with at least one comment making a direct inference of guilt.

Third, Steger's defense was not "transparently frivolous." Steger's alleged victims stated Steger fired at them unprovoked. Steger admitted he fired his Glock into the air, but claims he did so only after being shot at first by an unseen assailant. The credibility of the witnesses was a critical issue, and we cannot say Steger's defense was "transparently frivolous."

The final step in our analysis is to determine whether the State overwhelmingly established Steger's guilt. This is not the same inquiry as to whether the State made a submissible case. *See Dexter*, 954 S.W.2d at 342. *Dexter* guides our analysis in determining whether there was overwhelming evidence of Steger's guilt such that the repeated inadmissible references to Steger's invocation of the right to counsel would be considered harmless error. The *Dexter* Court stated:

> "[O]verwhelming evidence of guilt" means at a minimum that there is sufficient evidence to support a conviction without consideration of the inadmissible evidence, in this case the inadmissible references to appellant's silence. There must be no reasonable doubt that appellant committed the crime, and the degree of prejudice that occurred by use of

the inadmissible references to appellant's post-*Miranda* warnings silence must be insubstantial.

"Overwhelming evidence of guilt" is no easier to define than "manifest injustice," both being standards entirely dependent upon the facts of a particular case. "Manifest injustice" is a concept appellate courts may find impossible to define, but appellate courts "know it when they see it." *Frazier*, 927 S.W.2d at 384 (*quoting* 3A Charles Alan Wright, *Federal Practice and Procedure*, Sec. 856 (1982)). Likewise, a test to determine whether there is overwhelming evidence of guilt in a particular case is not easily articulated. Perhaps the most vivid articulation in Missouri's jurisprudence is that expressed in *State v. Martin*, 797 S.W.2d at 765 (Mo.App. E.D. 1990), "if [defendant] were tried one hundred times on this evidence, with or without [the detective's] testimony, she would be convicted one hundred times." (*quoting State v. Smart*, 756 S.W.2d 578, 582 (Mo.App. W.D.1988)(Nugent, J. concurring)).

*Dexter*, 954 S.W.2d at 342.

Evidence of Steger's guilt was not overwhelming. The credibility of the witnesses was essential to resolution of the issues at trial. The testimony consisted of conflicting statements between Steger and his alleged victims. Steger, Barrett, and Towell all admitted discharging weapons at each other, but all dispute who initiated the gunfire. The only prior instance of animosity between the parties was the ex parte order of protection, which was subsequently reversed in *Towell v. Steger*, 154 S.W.3d 471 (Mo.App. S.D.2005).

Further, the record reflects Steger has no prior convictions. Towell testified he had a previous conviction for driving while intoxicated, three convictions for driving while revoked, and three convictions for possession of a controlled substance. Kristina also testified she had a previous drug conviction. Barrett testified to various injuries he endured over the years and the fact that he was taking heavy narcotic pain medication on the day of the incident. These allegations may affect the witnesses' credibility. In the absence of the State's repeated inadmissible references to Steger's invocation of his right counsel, we cannot be assured that if Steger were tried one hundred times on this evidence, he would be convicted one hundred times.

Therefore, we hold the inadmissible references to Steger's request for counsel had a decisive effect on the jury by creating an inference of guilt. Since there were repeated *Doyle* violations, coupled with the fact that the evidence of guilt is not overwhelming, we hold these errors affected Steger's substantial rights and resulted in a manifest injustice requiring reversal for a new trial. Point granted.

 While we find Point I dispositive, we review Steger's remaining points because the analysis may be pertinent to the admission of evidence upon remand. In his second point, Steger claims the trial court plainly erred in allowing the State to adduce testimony regarding Steger's purported failure to plead self-defense immediately after being arrested. Again, Steger concedes this point has not been preserved for appeal; thus we review this allegation pursuant to Rule 30.20 for plain error.

Deputy Otte testified Steger told him during the post-arrest interview that "he had fired some shots in self-defense." Captain Petton contradicted Deputy Otte's testimony as follows:

[The State]: At any time during the exchange between you and him did he ever claim to you that he had been shot

at first, that he was just defending himself?

[Captain Petton]: No, sir.

[The State]: Even when you took him into custody under arrest, put the cuffs on him, didn't make any claim like that?

[Defense counsel]: Your Honor, I want to object to that. He's trying to switch it over and prove that we're—he's got the burden of proof beyond a reasonable doubt, not that we're proved [sic] innocent.

The Court: The objection is overruled.

[Captain Petton]: I don't recall him mentioning that at all.

[The State]: No indignation, you've got the wrong guy, you should have arrested him, nothing like that?

[Captain Petton]: No, sir.

[The State]: Just I can go wherever I want?

[Captain Petton]: That's basically what he told me.

■ Once a defendant carries the burden of injecting the issue of self-defense into the case, the burden then shifts to the State to prove beyond a reasonable doubt that the Steger did not act in lawful self-defense. *State v. Beck,* 167 S.W.3d 767, 788 (Mo.App. W.D.2005). There is no question Steger injected the issue of self-defense into the case. Steger testified he was shot at first by the victims. Conversely, the victims testified Steger shot at them first. The State presented the testimony of Captain Petton as part of its burden to prove Steger did not act in self-defense when he failed to state he was shot at first while being questioned by police. We cannot say the trial court committed plain error in allowing the State to offer evidence to meet its burden with respect to this issue. Point denied.

Alternatively, in his final point, Steger argues the trial court abused its discretion in allowing evidence of Steger's purported failure to plead self-defense immediately upon arrest, as detailed in Point II, in that the admission of this evidence likely misled or confused the jurors as to which party must carry the burden of proof relating to that defense. Defense counsel objected to the admission of this evidence on this ground and included it in the motion for new trial.

■ Trial courts retain broad discretion over issues of relevancy and admissibility of evidence, and we will not interfere with those decisions unless there is a clear showing of abuse of discretion. *State v. Uka,* 25 S.W.3d 624, 627 (Mo.App. E.D. 2000). A trial court will be found to have abused its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Rutter,* 93 S.W.3d 714, 729 (Mo. banc 2002). Additionally, we review for prejudice and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Richardson,* 923 S.W.2d 301, 311 (Mo. banc 1996).

■ As stated with respect to Point II, there was no error in admitting Captain Petton's testimony because it was in response to Steger's interjection of the theory of self-defense into the case. The State has the burden of proving beyond a reasonable doubt Steger did not act in lawful self-defense, and Captain Petton's testimony was used for that purpose. Moreover, the jury was instructed with respect to who carried the burden of proof at trial. Jurors are presumed to follow the trial court's instructions. *State v. Forrest,* 183 S.W.3d 218, 229 (Mo. banc 2006). The trial court did not abuse its discretion in admitting this testimony. Point denied.

The trial court's judgment is reversed and the cause is remanded for a new trial.

GARY M. GAERTNER, SR., J., and ROBERT G. DOWD, JR., concur.