STATE of Missouri, Respondent,

v.

Otis CORNELIOUS, Appellant.

No. WD 67321.

Missouri Court of Appeals,
Western District.

June 3, 2008.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 29, 2008.

James R. Hobbs, Kansas City, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, MO, Shaun Mackelprang, Asst. Attorney General, Jefferson City, MO, for respondent.

Before PAUL M. SPINDEN, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Otis Cornelious appeals his convictions for murder in the first degree and armed criminal action. Cornelious claims that the State impermissibly commented on his post-arrest silence in violation of his Fifth Amendment rights. Cornelious also claims that the prosecutor misled the jury as to the burden of proof on self-defense. We affirm.

### Background

Cornelious was charged with murder in the first degree in violation of section 565.020[1] and armed criminal action in violation of section 571.015 for events that occurred on the night of October 21, 2003. That night, Danetta Leggs and her brother, Antonio Leggs, were at Danetta's house with Antonio's girlfriend, Aunai Finley. Cornelious, along with his friend Aaron Stanley, came over to Danetta's house. While they were there, Cornelious and Antonio got into an argument. The argument escalated into a physical fight.

The fight dissipated, and Antonio walked into the kitchen. The testimony indicated that Antonio retrieved a knife from somewhere in the kitchen. Danetta testified that Antonio picked up a knife from the

---

1. All statutory references are to the Missouri Revised Statutes, 2000.

dishwasher. She said, however, he then put it back in the dishwasher. Stanley testified that Antonio began rummaging through kitchen drawers and took out a knife. Finley testified that Antonio went to the kitchen and picked up a knife. She could not recall whether it was from the sink or a drawer in the kitchen. All three agreed that Cornelious then left the house and returned moments later with a gun. Cornelious then shot Antonio three times. One of the shots was fatal. None of the three eyewitnesses saw Antonio make any threatening movements toward Cornelious when he returned. They could not agree, however, as to whether Antonio still had the knife in his hand when Cornelious returned to the house.

After the shooting, detectives attempted to find Cornelious in Missouri but were unsuccessful. After receiving information that Cornelious's cell phone was sending and receiving calls in Georgia, the detectives involved the FBI Task Force. The FBI was able to locate Cornelious in Georgia and arrest him. Cornelious had been using the name of his friend Aaron Stanley while in Georgia.

Cornelious was charged with first-degree murder and armed criminal action. A jury trial was held on September 27–29, 2005. The State presented the above-outlined evidence. Cornelious testified in his own defense. He stated that on the night of the shooting, he smelled PCP on Antonio and that Antonio was not acting like himself. Cornelious further testified that when Antonio pulled out the knife, Cornelious walked out the front door, but then came back because his friend Aaron Stanley was still in the house and he was also concerned about the other people in the house. Cornelious testified that when he came back in the house, Antonio came toward him in an attempt to stab him, and Cornelious pulled out his gun and fired in

self-defense. Cornelious conceded that there was nothing blocking his access to the exit of the house.

The jury found Cornelious guilty of both first-degree murder and armed criminal action. The court sentenced him to life imprisonment without the possibility of probation or parole for the murder charge and 27 years for the armed criminal action charge, sentences to run concurrently. Cornelious appeals. More necessary facts will be outlined in the argument sections of this opinion.

### Commenting on Silence

In his first point Cornelious claims that his Fifth Amendment rights as outlined in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), were violated when the prosecutor impermissibly commented on his post-arrest silence. The four alleged errors are as follows. First, during cross-examination of Cornelious, the prosecutor asked:

> And once you got to Georgia, you called the police, hotline, anonymous hotline, and said, "This is an anonymous call. You need to check into that shooting, because I think that guy that did it, did it in self-defense. You need to check that out—"

At that point, defense counsel objected to the line of inquiry and moved for a mistrial. The court sustained the objection but denied the motion for a mistrial. The court instructed the prosecutor to stay away from that line of inquiry, and Cornelious never answered the question.

The second instance occurred again during cross-examination of Cornelious. The following exchange took place:

> Q. [by the prosecutor] You remember the FBI agents coming down to Georgia?
>
> A. [by Cornelious] Yes, sir.

. . . .

Q. And then the FBI showed up? And they came to, is it Hollow Tree Apartments where you lived?

A. Yes.

Q. Did you say, "Hello, FBI agents, what can I do for you?"

A. No, I didn't.

Q. No. You ran from them, didn't you?

A. Yes.

No objection was made during this inquiry.

Finally, Cornelious points to two comments made by the prosecutor during his closing argument. Neither comment was objected to. First, the prosecutor declared,

And even if you buy this story of what happened in that home, think about his actions after this homicide. What would a reasonable person have done?

. . . .

Would a reasonable person acting in self-defense run and not call the police? Would a reasonable person then leave town, fly to Georgia and assume a new name and tell everyone that he is Aaron Stanley? A reasonable person acting in lawful self-defense does not do that.

Later the prosecutor argued:

And remember, their [Danetta's and Finley's] statements were taken hours, mere hours after they had just witnessed the man that they both love, be gunned down right before their eyes. Their statements were taken immediately after that homicide. *And who's had almost two years to think about what his story is going to be to the 12 of you?*

(Emphasis added.)

Because only one of these instances was objected to, it is the only one preserved for appellate review. The standard of review to apply to the first alleged error, then, is that outlined in *Chapman v. California,*

386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *State v. Dexter,* 954 S.W.2d 332, 340 n. 1 (Mo. banc 1997). The U.S. Supreme Court held in *Chapman,* that before a federal constitutional error can be held harmless, the court must declare that it was harmless beyond a reasonable doubt. 386 U.S. at 24, 87 S.Ct. 824.

■ The other alleged errors were unpreserved and, therefore, can be reviewed only for plain error. Rule 30.20; *see Dexter,* 954 S.W.2d at 340. Plain error affecting substantial rights may be considered in our discretion if we find that a manifest injustice or a miscarriage of justice has resulted therefrom. Rule 30.20. Plain error can serve as the basis for granting a new trial only if the error was outcome determinative. *State v. Baxter,* 204 S.W.3d 650, 652 (Mo. banc 2006). "Plain error review is used sparingly and is limited to those cases where there is a clear demonstration of manifest injustice or miscarriage of justice." *State v. Smiley,* 240 S.W.3d 214, 217 (Mo.App.2007). The appellant has the burden of proving the existence of a manifest injustice or miscarriage of justice. *Id.*

■ In all cases, whether the alleged error was preserved or not, we must consider the following factors:

(1) whether the government made repeated *Doyle* violations, (2) whether any curative effort was made by the trial court, (3) whether the defendant's exculpatory evidence is transparently frivolous, and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming.

*Dexter,* 954 S.W.2d at 340. We first determine whether any of these specific references actually crossed the *Doyle* line and, therefore, were erroneous.

■ The Fifth Amendment to the U.S. Constitution assures that a criminal defen-

dant shall be protected from compulsory self-incrimination. *State v. Steger,* 209 S.W.3d 11, 17 (Mo.App.2006). This privilege includes the requirement that police give the warnings outlined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which includes the right to remain silent. *Steger,* 209 S.W.3d at 17. In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, the U.S. Supreme Court held that the use of a defendant's post-warning silence for purposes of impeachment was a violation of due process. *Steger,* 209 S.W.3d at 17.

■ However, a defendant's pre-warning silence may be used for purposes of impeachment when the circumstances are such that the silence may be probative. *State v. Graves,* 27 S.W.3d 806, 810 (Mo.App.2000). Generally, this silence is used to impeach the defendant when "a neutral expectancy of an , exculpatory statement exists as a result of a defendant's testimony and defendant's silence is probative of inconsistencies in that testimony." *Id.* (*quoting State v. Antwine,* 743 S.W.2d 51, 69 (Mo. banc 1987)). In other words, when a defendant offers an explanation for his actions at trial and circumstances suggest that he would naturally have given the explanation earlier if the explanation were true, his previous silence may be used to impeach him if the silence was not the result of an exercise of his Fifth Amendment rights. *State v. Myers,* 997 S.W.2d 26, 31 (Mo.App.1999).

We have held that where a defendant claims self-defense, there is generally an expectancy that he would have given the explanation prior to trial if the explanation were true. *See Antwine,* 743 S.W.2d at 69; *see also State v. Cummings,* 779 S.W.2d 10, 12 (Mo.App.1989). There is no suggestion in the record that, after fleeing to Georgia and prior to being apprehended by the FBI agents, Cornelious was given any *Miranda* warnings. The encounter with the FBI was the first that he had with any law enforcement after the death of Antonio Leggs.

■ Thus, the prosecutor's comments about Cornelious's failure to call the police and inform them that the shooting was in self-defense, the one alleged error that was preserved, was not an impermissible comment on Cornelious's silence in violation of *Doyle.* Given that there was no *Doyle* violation, the court certainly did not err in failing to declare a mistrial.

■ Next, the prosecutor's questions to Cornelious about his fleeing from the FBI and the prosecutor's argument that a reasonable person would not have fled to Georgia but would have contacted the police and told them he acted in self-defense also were not violations of *Doyle.* Any comments on his silence at the time he was fleeing were not impermissible but were legitimate methods of impeaching his credibility. *See Antwine,* 743 S.W.2d at 69. Moreover, flight from police is permissible evidence of guilt. *See State v. McCleod,* 186 S.W.3d 439, 444–45 (Mo.App.2006). We discern no error, plain or otherwise, from the trial court's failure to act when these statements were made.

■ Finally, we turn to the prosecutor's statement that Cornelious had two years to think about his story. The record does not reveal exactly when Cornelious was first given his *Miranda* warnings and first asserted his Fifth Amendment rights, but we can assume he was advised of and did assert his rights relatively soon after his arrest and before the date of trial. Therefore, the prosecutor's statement did comment on Cornelious's post-arrest, post-*Miranda* silence at least somewhat.

We next consider whether this comment amounted to or resulted in a manifest injustice or a miscarriage of justice. Corne-

lious's credibility was an important part of the outcome of the trial. Three eyewitnesses had testified that Antonio Leggs had made no threatening movements toward Cornelious when Cornelious fired. Danetta Leggs's and Aunai Finley's testimony at trial also was consistent with the statements they gave to the police immediately after the shooting. Moreover, the third eyewitnesses was Aaron Stanley, Cornelious's friend, who had no apparent interest in seeing Cornelious convicted and was present at trial under subpoena against his will. The testimony of these three eyewitnesses was consistent with one another and inconsistent with Cornelious's testimony.

Additionally, as the prosecutor pointed out earlier, and as we have already noted, Cornelious fled to another state and began using another name to avoid law enforcement. Thus, his actions after the shooting were indicative of a guilty conscience rather than consistent with those of someone who had been forced to shoot a friend in self-defense.

Finally, Cornelious admitted that there was nothing that blocked him from being able to leave the house before shooting Antonio Leggs. Even if the jury had believed Cornelious that Antonio Leggs had come toward him to attack him, the jury could also conclude that the only reasonable thing for Cornelious to do was to leave the house rather than shoot Mr. Leggs.

A court should rarely grant relief on an assertion of plain error as to matters contained within closing argument. *State v. Wallace*, 952 S.W.2d 395, 396 (Mo.App. 1997). In the absence of an objection and request for relief, the court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention. *Id.*

It is true, of course, that comments on a defendant's pre-trial silence about self-defense can, in certain situations, tend toward unfairness, even when the defendant was not provided *Miranda* warnings. Such comments on silence may also lack probative value when an accused has been advised by a lawyer, because lawyers typically instruct their clients, self-defense or not, not to make statements. But here, any unfairness was minor in view of the fact that the defendant, rather than claim justified self-defense, chose to run from the area and hide. The State was permitted to argue the evidence of flight. The notion that the defendant had "two years to think about his story" was linked to the defendant's flight from the state. Where there is no objection to the closing argument, we are reluctant to say that the court had a duty to intervene *sua sponte*. In this case, we discern no extraordinary circumstances warranting intervention by the trial court *sua sponte* to declare a mistrial. Point I is denied.

### Self–Defense Instruction

Cornelious next argues that the court erred in failing to grant a mistrial after the prosecutor showed the jury an erroneous self-defense instruction and after the prosecutor incorrectly stated the law on self-defense during his closing argument.

The record reveals that during his closing argument, the prosecutor showed to the jury a demonstrative aid that indicated that the jury should find Cornelious "not guilty if he did not act in self-defense." An objection was made. The prosecutor agreed that the language was erroneous and indicated that it was merely a typographical error. The demonstrative aid was removed, and defense counsel indicated he was satisfied with the correction. He did not request a mistrial.

Later during closing, the prosecutor made the following comments:

> Murder in the 1st Degree first. If you don't find that, which you will, you're looking at Murder in the 2nd Degree. And there's no evidence of self-defense. It's not proving beyond a reasonable doubt that he did do it. It's just that simple.

No objection was made to this statement and no mistrial was requested. Therefore, Cornelious is entitled only to plain error review of these alleged errors. *See* Rule 30.20.

 Generally, if the trial court declares a mistrial without the defendant's request for or consent to a mistrial, the Double Jeopardy Clause bars retrial of the defendant. *State v. Tolliver*, 839 S.W.2d 296, 299 (Mo. banc 1992). The defendant's right to have the trial completed by a particular tribunal is implicated, and the recognized exceptions permitting a retrial are only where there is a "manifest necessity" for the declaration of a mistrial or where the "ends of public justice" would otherwise be defeated. *Id.*

 We do not discern such a situation here. First, the demonstrative aid was clearly a typographical error. After the aid was removed, the prosecutor even stated to the jury that it was a typographical error and thanked the judge for catching the error in the presence and hearing of the jury. Any confusion on the part of the jury would have been cleared when the aid was removed and the prosecutor stated that it was a typographical error.

 The prosecutor's comments made during closing argument are not entirely intelligible. The prosecutor appears to first say there is no evidence of self-defense, and then go on to say that "something" does not prove beyond a reasonable doubt that he "did do it." It is not clear whether "he did do it" meant that Cornelious did shoot Mr. Leggs, or Cornelious did shoot in self-defense. We do not believe the comment would be understood as asserting that it was the defense's burden to prove Cornelious acted in self-defense rather than the State's burden to prove that he did not act in self-defense.

 In any event, even if any confusion resulted from these comments, a misstatement of the law is generally harmless error if the court properly instructs the jury. *State v. Hashman*, 197 S.W.3d 119, 135 (Mo.App.2006) (*quoting Lingar v. Bowersox*, 176 F.3d 453, 460 (8th Cir. 1999)). Unfortunately, we are unable to examine the jury instructions because they were not provided for us. Cornelious, however, makes no claim that any instructions were erroneous. Both Cornelious and the State appear to agree that the jury was properly instructed. Although we would prefer to view the instructions ourselves, we presume that the jury was given proper instructions on the burden of proof as to self-defense. Jurors are presumed to follow the instructions of the trial court. *Steger*, 209 S.W.3d at 20. Cornelious has pointed us to nothing in the record that indicates the jury did not follow the court's instructions.

Finally, as we have noted in point one, there was ample reason for the jury to conclude that Cornelious did not act in lawful self-defense. We discern no manifest injustice or miscarriage of justice. Point II is denied.

### Conclusion

For all of the foregoing reasons, the judgment is affirmed.

SPINDEN and ELLIS, JJ., concur.