**STATE of Missouri, Respondent,**

v.

**Drew Matthew RYLAND, Appellant.**

WD 79762

Missouri Court of Appeals, Western District.

Opinion filed: September 26, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied October 31, 2017.

Application of Transfer Denied December 19, 2017

Daniel N. McPherson, Jefferson City, for Respondent.

Keith P. O'Connor, for Appellant.

Before Division Two: Edward R. Ardini, Jr., Presiding Judge, Karen King Mitchell, Judge and Anthony Rex Gabbert, Judge

**EDWARD R. ARDINI, JR., JUDGE**

Drew M. Ryland (Ryland) appeals his convictions for one count of murder in the second degree, one count of resisting a lawful stop, three counts of assault in the second degree, and four counts of armed criminal action following a jury trial. Ryland argues that the trial court erred in allowing the State to inaccurately define reasonable doubt and impermissibly inject excessive emotion into its closing argument, in not permitting use of prior municipal ordinance violations to establish a witness's bias, and by denying his motion for acquittal.[1] Finding no error, we affirm.

---

1. Ryland also filed a Motion to Remand to Circuit Court for a hearing on his first amended motion for new trial on the basis of newly discovered evidence. According to the motion, Ryland has enhanced the dashcam video taken from the police cruiser and argues that it establishes that Ryland was not the driver of the Suburban that caused the fatal accident from which this case arises. The court has reviewed the images taken from the enhanced video submitted with the motion and, based on their limited resolution and quality, we are not persuaded that they are probative on the issue of who was driving the Suburban. Regardless, contrary to Ryland's characterization, the photos obtained from the enhanced video do not constitute newly discovered evidence. " 'Newly available' evidence is not synonymous with 'newly discovered' evidence for purpose of a new trial motion." *State v. Smith*, 181 S.W.3d 634, 638 (Mo. App. E.D. 2006). "Newly discovered evidence [] is evidence that the defendant was not aware existed until after the conclusion of the trial." *Id.* The video was provided to the defense prior to trial and there is no allegation that the enhancement process used to produce the images that are the subject of this motion was not available at the time of trial. As a result, these images do not constitute newly discovered evidence. *See id.* Failing to bring forward "newly discovered evidence," Ryland has not established that he is entitled to a remand. *See State v. Reed*, 971 S.W.2d 344, 349 (Mo. App. W.D. 1998). Ryland's Motion to Remand to Circuit Court is denied.

## Factual and Procedural Background [2]

On September 19, 2014, Ryland met Brandon Harris (Harris) and Tyler Beisel (Beisel) at the home of Ryland's mother in Independence. The three consumed some beer, took several shots of tequila, and smoked marijuana before taking Ryland's white 2001 Chevrolet Suburban to Grain Valley to pick up a fourth man identified as Wes.[3] The group then drove to the Power and Light District in downtown Kansas City where they drank for several hours before continuing to Westport, where they consumed more alcohol, before heading home.

Kansas City Police Officer Chad Fowler was patrolling the Westport area in an unmarked police cruiser during the early morning hours of September 20th. At approximately 12:47 a.m., he observed Ryland's Suburban traveling at a high rate of speed at the intersection of 42nd Street and Southwest Trafficway. Officer Fowler turned onto Southwest Trafficway and saw the Suburban run a red light at 39th Street. He continued following the Suburban and activated his lights and siren after observing it run a second red light at Valentine Road. Officer Fowler pursued the Suburban on Southwest Trafficway at speeds reaching 90 miles per hour before the Suburban was forced to a stop at the intersection with 31st Street due to multiple cars blocking its ability to proceed. Officer Fowler pulled directly behind the Suburban and shined his spotlight to indicate to the driver that he was attempting to stop the vehicle. However, the other vehicles at the intersection began to move allowing the Suburban to veer sharply to the right and gain access to 31st Street. Once on 31st Street, the Suburban again accelerated to a high rate of speed before entering into the oncoming lane of traffic to avoid more vehicles stopped at a red light at the intersection with Broadway.

Officer Fowler followed the Suburban onto 31st Street before discontinuing the pursuit. At trial, he testified that he ended the pursuit because he believed the driver was not going to stop and police policy authorized pursuits only in situations where a person has committed a violent felony. Officer Fowler further testified that, based on his training and experience, the driver of the Suburban was operating in a manner that created a substantial risk of serious physical injury or death to others. His assessment proved sadly accurate as, just moments after terminating the pursuit, the Suburban collided with a Dodge Charger occupied by Malcolm Timley (Timley) and Michael Hernandez (Hernandez) near the intersection of 31st Street and Grand Avenue.

A resident who lived near the location of the crash, and who had been outside talking on her phone, testified that she did not hear the sound of screeching tires before the crash. This testimony was corroborated by data recovered from the Suburban that showed no signs of braking prior to the crash. Rather, the data indicated that during the five seconds before the collision "the throttle showed to be depressed 100 percent, basically meaning that [the driver] had the pedal to the floor." An accident reconstructionist testified that the Charger had been traveling in its lane of traffic when the Suburban, traveling at 80 to 81 miles per hour in the wrong lane of traffic, collided with it. The Suburban caught fire shortly after the impact, burning the entire interior and engine compartment.

**2.** We view the evidence in a light most favorable to the verdict. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009).

**3.** Wes left the group early and returned home at some point in the evening after being given money for a cab by Ryland.

Multiple individuals who immediately responded to the crash scene were called to testify at trial. One witness testified that she saw an individual exit the Suburban through the driver's side rear door and, when asked his name, the individual responded with a name starting with a "D" or just said "D." The witness identified Ryland's jacket, which was recovered by police at the hospital following the crash, as the one worn by the individual she saw exiting from the driver's side of the Suburban. Several other witnesses testified that they saw two individuals lying on the ground on the passenger's side of the vehicle. These individuals were helped to the sidewalk where they were treated by EMTs. One of these individuals was identified as Harris, who told the EMT treating him that he had been a passenger in the Suburban.

Ryland and Beisel were taken to St. Luke's Hospital following the crash. Ryland was interviewed by a detective within two hours of the collision. The detective testified that he smelled a strong odor of alcohol on Ryland's breath. When the detective identified himself to Ryland and told him that he was there to question him about the wreck, Ryland responded by asking "Am I in trouble?" When the detective advised him that he did not know the details of the crash, Ryland proceeded to ask him "How many people did I hurt?" A search warrant was obtained and Ryland's blood was drawn at approximately 5:45 a.m., close to five hours after the crash. He was found to have a blood alcohol content of .145 at that time. At trial, Ryland testified that he could not recall who had driven the Suburban from Westport and could not remember anything about the crash.

Beisel was interviewed at the hospital by an officer approximately five hours after the accident. Beisel indicated that he had

been sitting in the front passenger seat, that Harris had been seated behind him, and that Ryland had been driving. The officer returned the next day and Beisel provided a similar statement, which was recorded by the officer. In addition, Beisel was shown a photograph of Ryland and wrote on the back that he was "100% sure Drew Ryland was driving away from Westport." At trial, Beisel testified that Ryland visited him in the ICU several days after the crash. According to Beisel, Ryland apologized for causing the accident and suggested that the two of them tell law enforcement that Harris had been driving the Suburban. Nevertheless, Beisel testified at trial that Ryland, not Harris, had been driving.

Harris was taken to Truman Medical Center following the collision. He was first interviewed by police approximately an hour after the crash. At that time, he told an officer that the vehicle he had been in was a yellow 2003 Suburban; that it had been driven by a man named "Drake;" [4] and that there were two other passengers in the car, one male and one female. The officer requested permission to test Harris's blood, to which Harris responded that "marijuana might come back in it," but that he was not driving so it was fine and consented to the blood draw. His blood alcohol content was .221.

Harris was interviewed by police a second time later the same day and this time gave a statement that was consistent with the one given by Beisel; namely that he, Beisel, and Ryland had left Westport in the Suburban; that Ryland had been driving; that Beisel had been in the front passenger's seat; and that he had been seated behind Beisel. This statement was later supplemented after Harris remembered that he had asked Ryland to stop

---

4. Drake is the name of Ryland's brother.

when he became aware that the police were following them. Harris was also shown a photo of Ryland and wrote and signed on the back that he was "100% sure that Drew [Ryland] was driving when the crash occurred." At trial, Harris testified that he could remember leaving the last bar in Westport, Ryland driving, Beisel yelling "shotgun," Ryland trying to find a station on the radio as the vehicle ran a stoplight, and a Crown Victoria pulling up behind them followed by Ryland accelerating. He remembered nothing else from that night and his next memory was waking up in the trauma unit.

Hernandez and Timley, the passengers in the Charger that was struck in the collision, both suffered severe injuries from the crash. Timley spent two weeks in the hospital followed by five months in a wheelchair or bed and was still experiencing severe physical limitations at the time of trial. Hernandez suffered a bruised skull, blood accumulation on his brain, a broken nose, several fractured ribs, and bruises to the chest, abdomen, flanks, on the back of the heart, and to the lining of both lungs. Blood was found in both sides of the chest, in the stomach, and in the esophagus. Doctors were forced to remove several of his internal organs, including his spleen and a portion of his large bowel. He developed an infection in his lungs and in the area where his spleen was removed. Hernandez died on October 8, 2014, eighteen days after the accident, of complications from multiple blunt force trauma.

Ryland was charged with one count of the class D felony of resisting a lawful stop in a manner creating a substantial risk of serious physical injury or death; one count of the class A felony of second degree (felony) murder for the death of Hernandez, with the aforementioned resisting a lawful stop constituting the underlying felony offense; three counts of the class C felony of assault in the second degree for the injuries inflicted on Timley, Harris, and Beisel; and four counts of armed criminal action.[5]

Ryland's primary defense at trial was that he had not been the driver of the Suburban, and he attempted to establish that Harris was behind the wheel at the time of the crash. He sought to discredit the statements given to police by Beisel and Harris shortly after the accident by arguing that they had both suffered head injuries which impacted their ability to remember who had been driving and that they had been pressured by police to identify Ryland as the driver. To that end, Ryland called two members of the medical staff at St. Luke's who had attended to Beisel. A treating doctor testified that Beisel had originally told hospital staff that he had been in a motorcycle accident. A nurse further noted that Beisel showed signs of short-term memory loss immediately following the crash and had been given several different forms of pain medication during the early hours of September 20th. Ryland's counsel also cross-examined the officer who interviewed Harris regarding the fact that, according to Harris's treating physician, Harris could not recall the events that had occurred that morning and had a concussion.[6] Finally, one of Ryland's friends testified that he had seen

---

5. Harris and Beisel were both injured in the crash. Harris suffered fractured ribs on his left side, a fractured left leg that resulted in permanent nerve damage, multiple contusions, and a concussion. Beisel suffered a torn artery that required bypass surgery, a col-

lapsed lung, a shattered heel, broken ribs, and "road rash" down his backside.

6. The same officer stated on redirect that he had been told by a medical professional treating Harris that he was fit to provide a statement prior to posing any questions to him.

Ryland, Harris, and Beisel as they left a bar in Westport. This individual testified that when he first spoke to the three men in the parking lot of the bar, Harris indicated that he was going to drive them home. He also stated that he saw the Suburban leaving the parking lot a short time later and that Ryland had spoken to him from where he was sitting in the backseat.

Ryland was found guilty on all counts and was sentenced to twenty years for second degree (felony) murder, four years for resisting a lawful stop, three years on each count of assault in the second degree related to Beisel and Harris, seven years on the assault in the second degree related to Timley, and three years on each count of armed criminal action, with all sentences running concurrent to each other. Ryland now appeals.

## Discussion

Ryland raises three points on appeal. In his first point, he argues that the trial court committed plain error by allowing the State to inaccurately define reasonable doubt and impermissibly use excessive emotion during its closing argument. In his second point, Ryland argues that the trial court erred in granting the State's motion *in limine* prohibiting the use of three municipal driving while intoxicated violations against Brandon Harris to demonstrate his bias for identifying Ryland as the driver of the Suburban. Finally, Ryland contends that the trial court erred in denying his motion for acquittal arguing there was not sufficient evidence to establish that he was resisting a lawful stop in a manner that created a substantial risk of serious physical injury or death. We will consider these arguments in the order they are presented.

### Statements Made During Closing Arguments

█ In his first point on appeal, Ryland argues that the State inaccurately defined reasonable doubt during its closing argument. Specifically, Ryland points to the following two portions of the State's closing argument:

Now, before I go into the actual meat of the instructions, I want to cover some of these subjects or some of these phrases that you heard that you may not be familiar with. Reasonable doubt. Use your reason and common sense. Your gut. What does your gut tell you? More importantly, what does your heart tell you? That he's guilty.

. . .

But he didn't stop there. He asked how many people he hurt. Brandon Harris, although he was drunk that night and might not have made the best decisions, didn't hurt anybody. He didn't kill anybody. Tyler Beisel was drunk and made bad decisions that night, but he didn't kill anybody. The one person who hurt and killed people woke up and asked how many. His plan to blame Harris, Travis Jenkins. Let's look at Mr. Jenkins. And this is where you use common sense and kind of your gut or your heart. I don't know to what degree Mr. Jenkins is lying. But I know he's lying.

He claims that not only did these statements improperly suggest that the jury should "rely on their gut" in determining if the evidence met the standard of reasonable doubt, but that they also impermissibly played on the jury's emotions by telling them to "follow their heart" in reaching their decision. Ryland acknowledges that he did not properly preserve this issue for appeal, but requests plain error review.

█ We may review unpreserved claims for plain error at our discretion.

*State v. Chambers*, 481 S.W.3d 1, 7 (Mo. banc 2016). "Plain error is found when the alleged error facially establish[es] substantial grounds for believing a manifest injustice or miscarriage of justice occurred." *State v. Taylor*, 466 S.W.3d 521, 533 (Mo. banc 2015) (quoting *State v. Driskill*, 459 S.W.3d 412, 426 (Mo. banc 2015)) (internal quotation marks omitted). "Such errors must be 'evident, obvious, and clear.'" *Id.* (quoting *State v. Hunt*, 451 S.W.3d 251, 260 (Mo. banc 2014)). However, "[p]lain error relief as to closing argument should rarely be granted and is generally denied without explanation." *State v. McClendon*, 477 S.W.3d 206, 217 (Mo. App. W.D. 2015) (quoting *State v. Crowe*, 128 S.W.3d 596, 600 (Mo. App. W.D. 2004)). This is because "[a] trial court has broad discretion in controlling the scope of closing argument." *Id.* (quoting *Crowe*, 128 S.W.3d at 600). Therefore, "[e]ven if a closing argument is improper, we will reverse a conviction only if the defendant establishes that the comment had a decisive effect on the jury's determination." *Id.* (quoting *Crowe*, 128 S.W.3d at 600). "To meet this standard, the defendant must demonstrate a reasonable probability that the verdict would have been different had the error not been committed." *Id.* Ryland has failed to meet this burden.

 Ryland concedes that the jury was properly instructed under MAI-CR 302.04, which included the correct reasonable doubt standard, and we presume that the jury followed the instructions issued by the trial court. *State v. Prince*, 518 S.W.3d 847, 857 (Mo. App. W.D. 2017). Ryland offers no evidence to rebut this presumption, but instead asserts that we should overlook it because the jury was also given MAI-CR 302.06 which states that counsels' closing "arguments are intended to help [the jury] in understanding the evidence and applying the law." He argues, without any sup-

porting authority, that this instruction functioned as a "stamp of approval" on the definition of reasonable doubt given in the State's closing argument and would be "no different from reading and then sending back printed jury instructions instructing the jury to 'apply' the law as argued to them in closing." However, MAI-CR 302.06 also specifically instructs the jury that closing arguments are not to be considered evidence and that their duty is to be governed by "the law *as given in these instructions*." (emphasis added). Therefore MAI-CR 302.06 did not, as Ryland suggests, tell the jury to treat the State's closing argument as if it were a written jury instruction, but rather, directed the jury to do the opposite and to be guided by the written instructions given to them by the trial court.

Missouri courts have considered numerous cases where the State was alleged to have misstated the law during closing arguments and found no manifest injustice based on the jury having been properly instructed on the law by the trial court. *See State v. Burnfin*, 606 S.W.2d 629, 631 (Mo. 1980) ("The court gave the jury the approved instruction on reasonable doubt.... It was also told that the arguments of counsel did not constitute evidence, and that in their deliberations the jury should 'be governed' by the evidence as they remembered it 'and by the law as given in these instructions.' Assuming, as we have done, that the prosecutor's statement was improper, in view of the instructions that were given by the court, we cannot say as a matter of law that a jury composed of reasonably intelligent persons were confused or misled by the argumentative statement of the prosecutor so as to result in manifest injustice or a miscarriage of justice."); *State v. Edwards*, 116 S.W.3d 511, 537–38 (Mo. banc 2003) ("[W]hile the prosecutor did misstate the law at one point, the correct standard of

proof was restated multiple other times during *voir dire* and in argument, and the jury was properly instructed. No manifest injustice resulted."); *State v. Blakeburn*, 859 S.W.2d 170, 175 (Mo. App. W.D. 1993) ("Viewing the comment in light of the entire record, we find that the trial court did not abuse its discretion in overruling appellant's motion for a mistrial. While the [prosecutor's] comment in isolation was an inaccurate statement of the law, we find that no prejudice resulted due to the fact that the prosecutor, after making the comment, read the instruction to the jury which contained a correct statement of the law."); *State v. Neal*, 849 S.W.2d 250, 255 (Mo. App. W.D. 1993) ("The trial court gave the jury the approved instruction on reasonable doubt, MAI–CR3d 302.04. It informed the jury that counsel's arguments did not constitute evidence and that they must be governed by the evidence as they remembered it and by the law as given in the instructions. For these reasons, we do not find that manifest injustice resulted from the prosecutor's argument."). We can find no reason to distinguish the present case from these prior ones.

■ Whether or not a plain error has occurred "is determined by the facts and circumstances of the case, and the defendant bears the burden of establishing manifest injustice." *State v. Simmons*, 515 S.W.3d 769, 776 (Mo. App. W.D. 2017) (quoting *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006)). Ryland has presented no evidence to suggest that the jury did not follow the written instructions submitted to it by the trial court, which we presume they followed. Therefore, Ryland has failed to meet his burden. *State v. Cornelious*, 258 S.W.3d 461, 468 (Mo. App. W.D. 2008) ("[A] misstatement of the law is generally harmless error if the court properly instructs the jury."); *State v.*

*Hashman*, 197 S.W.3d 119, 135 (Mo. App. W.D. 2006) ("When counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence.") (quoting *Lingar v. Bowersox*, 176 F.3d 453, 460 (8th Cir. 1999)). Ryland's first point on appeal is denied.

## Use of Municipal Ordinance Violations

■ Ryland's second point on appeal asserts that the trial court erred in granting the State's motion *in limine* prohibiting the use of Harris's three prior municipal violations for driving while intoxicated to impeach his testimony. He argues that the use of these prior violations was permissible to establish Harris's bias in identifying Ryland as the driver of the Suburban. In particular, Ryland asserts that Harris was motivated to deny being the driver of the Suburban because, if he were to have admitted to being the driver, he could have faced a felony driving while intoxicated charge based on his prior municipal dispositions.

■ "[A] ruling on a motion *in limine* is interlocutory and subject to modification at trial." *State v. Blurton*, 484 S.W.3d 758, 775 (Mo. banc 2016). "Accordingly, a 'motion in limine, in and of itself, preserves nothing for appeal.'" *Id.* (quoting *State v. Cole*, 71 S.W.3d 163, 175 (Mo. banc 2002)). In order to preserve a claim relating to a motion *in limine*, "the proponent must attempt to present the excluded evidence at trial and, if it remains excluded, make a sufficient offer of proof." *State v. Hunt*, 451 S.W.3d 251, 263 (Mo. banc 2014). Where an appellant fails to preserve his claim, this court may only review for plain error. *See id.* Ryland admits that he made no effort to use the municipal violations at trial and failed to make an offer of proof. As such, we are limited to reviewing

for plain error and therefore constrain our analysis to determining whether there was an "evident, obvious, and clear" error that "facially establish[es] substantial grounds for believing a manifest injustice or miscarriage of justice occurred." *State v. Taylor*, 466 S.W.3d 521, 533 (Mo. banc 2015) (quoting *State v. Driskill*, 459 S.W.3d 412, 426 (Mo. banc 2015) (internal quotation marks omitted); *State v. Hunt*, 451 S.W.3d 251, 260 (Mo. banc 2014)).[7]

The basis of the State's motion *in limine* was that a municipal ordinance violation is not a crime under section 491.050 and thus cannot be used to impeach a witness.[8] *See First Nat. Bank of Fort Smith v. Kansas City Southern Ry. Co.*, 865 S.W.2d 719, 737 (Mo. App. W.D. 1993) ("Crime," as used in statute authorizing use of prior convictions to impeach witness in civil or criminal case, does not include municipal ordinance violations.). Ryland does not contest the fact that Harris's prior municipal violations are not "crimes" under section 491.050, but rather, argues that he should have been permitted to use them to expose Harris's bias. Ryland's defense relied substantially on establishing that he had not been the driver of the Suburban at the time of the collision and

that it was actually Harris who had been driving. To that end, he wanted to illustrate Harris's motivation for testifying that he was not the driver. Specifically, Ryland points to the fact that, based on Harris's three prior municipal violations, a fourth driving while intoxicated charge was eligible for enhancement to a class C felony. *See* §§ 577.001, 577.010, 577.023. Therefore, Ryland argues that he was entitled to use the prior municipal violations to reveal Harris's bias or motivation for denying that he was the driver of the Suburban. This argument misses the mark.

Under Ryland's theory, Harris's motivation to identify Ryland as the driver of the Suburban stemmed from the fact that, based on the prior municipal violations, he could have faced a felony driving while intoxicated charge if he admitted to being the driver. The source of this alleged bias therefore was the possible felony charge and not, as Ryland attempts to argue, the prior municipal violations that merely would have served as the predicate for the felony enhancement. This distinction between the alleged bias (that Harris could have faced a felony driving while intoxicated charge if he admitted to being the

---

7. Ryland seeks to avoid plain error review by arguing that, because he alleges the trial court's ruling violated his constitutional right to confront a witness against him, he is entitled to *de novo* review. He relies on the case of *State v. Justus* where our Supreme Court noted that "[w]hether admission of the challenged testimony violated the Confrontation Clause is a question of law, which the Court reviews *de novo*." *State v. Justus*, 205 S.W.3d 872, 878 (Mo. banc 2006). While it is undeniably accurate that questions requiring constitutional interpretation are given *de novo* review, such questions must still be properly preserved. *State v. Simms*, 501 S.W.3d 442, 444 (Mo. App. W.D. 2016). Where, as is the case here, a defendant fails to properly preserve his constitutional claim of error, the appellate court may only review for plain error. *See, e.g., State v. Baxter*, 204 S.W.3d

650, 652 (Mo. banc 2006); *State v. Adkison*, 517 S.W.3d 645 (Mo. App. W.D. 2017).

8. All statutory citations are to the Revised Statutes of Missouri, 2000, as supplemented prior to January 1, 2017. Section 491.050 states as follows: "Any person who has been convicted of a crime is, notwithstanding, a competent witness; however, any prior criminal convictions may be proved to affect his credibility in a civil or criminal case and, further, any prior pleas of guilty, pleas of nolo contendere, and findings of guilty may be proved to affect his credibility in a criminal case. Such proof may be either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer."

driver) and the reason why he was eligible for the felony enhancement (based on his three prior municipal violations) is important and reveals the flaw in Ryland's argument. While Ryland's complaint is singularly focused on not being permitted to use the prior municipal violations, he fails to consider that, in ruling on the State's motion *in limine*, the trial court did not prohibit him from questioning Harris about the potential felony charges he may have faced if he were to admit to being the driver. On the contrary, the trial court authorized Ryland to question Harris about those possible felony charges, including the same felony charges that were filed against Ryland. Those charges included a class A felony, four counts of armed criminal action, and three class C felonies for assault in the second degree, which meant that Harris would have been exposing himself to significant criminal liability—well beyond the class C felony of driving while intoxicated that forms the basis of Ryland's complaint—if he admitted to being the driver. Therefore, Ryland *was* granted the opportunity to impeach Harris by showing his motivation for identifying Ryland as the driver.

■■■ "While a meaningful opportunity for cross-examination is necessary, 'the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *State v. Perry*, 275 S.W.3d 237, 244 (Mo. banc 2009) (quoting *United States v. Owens*, 484 U.S. 554, 557, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988)). Ryland was permitted by the trial court to explore Harris's incentive for denying he was the driver of the Suburban and implicating Ryland. Specific use of the prior municipal violations was not needed to reveal this alleged bias or motivation and was thus unnecessary for an effective cross-examination.[9] Ryland's second point on appeal is denied.

### Sufficiency of the Evidence

■■■■■■ Ryland's third point on appeal attacks the sufficiency of the evidence that he resisted a lawful stop in a manner that created a substantial risk of serious physical injury or death. "Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt." *State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016). This court views the evidence and all reasonable inferences therefrom in a light most favorable to the verdict and

---

**9.** In his reply brief, Ryland argues that the use of Harris's prior municipal convictions were necessary to impeach the statements he made to police shortly after the crash but before Hernandez died. Ryland contends that because Hernandez had not died by the time Harris made these statements, Harris could not have known that he would have faced a possible murder charge if he admitted to driving the Suburban and thus the potential felony enhancement for his fourth driving while intoxicated offense could have been a motivating factor to lie to the police about who had been driving when he made the statements. However, we note that Harris presumably would still have been aware that he could face multiple charges for assault in the second degree and armed criminal action if he admitted to being the driver owing to the injuries inflicted on the passengers of the two vehicles. Assault in the second degree is also a class C felony and so Harris would have had just as much motivation to avoid it as he would a possible driving while intoxicated enhancement. Further, the trial court specifically ruled that Ryland could question Harris about the fact that he would have been facing "all these other potential charges" if he admitted to being the driver. Ryland was therefore given his opportunity to effectively impeach the statements Harris made to police before Hernandez died, and the trial court's granting of the State's motion *in limine* did not result in manifest injustice to him.

disregards any evidence and inferences contrary to the verdict. *Id.*

Under section 575.150, the offense of resisting a lawful stop is committed when a person flees from an officer they know or reasonably should know is attempting to lawfully detain or stop an individual or vehicle. Resisting a lawful stop is a class A misdemeanor unless the individual flees in a manner that creates a substantial risk of serious physical injury or death, in which case it is a class D felony. § 575.150. In the video taken from Officer Fowler's dashboard camera, Ryland's Suburban is first observed traveling northbound on Southwest Trafficway at a high rate of speed at 12:47:34.[10] Officer Fowler turned onto Southwest Trafficway to follow the Suburban, which can be seen running a red light at the intersection with 39th Street. Officer Fowler activated his lights and siren at 12:48.01 after the Suburban ran a second red light at the intersection with Valentine Road. Therefore, it is at this point that Ryland first begins resisting a lawful stop.

Officer Fowler pursued the Suburban on Southwest Trafficway for several blocks before the Suburban became boxed in by stationary vehicles at the intersection with 31st Street at 12:48:40. As Officer Fowler attempted to further signal the driver to stop by shining his spotlight at the driver's side mirror, several cars began shifting position, allowing the Suburban to quickly cut across a lane and turn onto 31st Street. Once on 31st Street, the Suburban again accelerated. Officer Fowler followed the Suburban onto 31st Street and deactivated his siren at 12:49:03 just as the Suburban began to enter the oncoming lane of traffic to avoid more vehicles stopped at 31st Street and Broadway. The video shows that he deactivated his lights at 12:49:08, after the Suburban had fully entered the oncoming traffic lane. The collision occurred approximately 2,000 feet later near 31st Street and Grand Avenue.

The video reveals that Officer Fowler was trailing considerably behind the Suburban throughout the pursuit while reaching speeds between eighty and ninety miles per hour. Therefore, the Suburban was clearly travelling well in excess of twice the posted speed limit of thirty-five miles per hour. Further, the chase took place at night, when road visibility is naturally inhibited, on streets with numerous traffic signals. In addition, the Suburban is seen weaving around several cars and cutting across a lane of traffic at the intersection of Southwest Trafficway and 31st Street, narrowly avoiding other vehicles. Finally, at the end of the video, the Suburban is seen entering into the oncoming lane of traffic just prior to Officer Fowler deactivating his lights and terminating the pursuit.[11] Considering these facts, we find

---

**10.** The times used in this opinion are taken directly from the timestamps displayed in the video from Officer Fowler's dashboard camera.

**11.** The parties' briefs debate at length whether Ryland's behavior at the end of the chase should be considered as part of the evidence supporting the jury's finding that he fled from police in a manner likely to create a substantial risk of serious physical injury or death. Specifically, Ryland argues that Officer Fowler had deactivated his lights and siren prior to the Suburban entering into oncoming traf-

fic and consequently that action cannot be considered because, at that point, there was no longer an attempt by law enforcement to stop the vehicle and thus he could no longer be resisting a lawful stop. However, Ryland's argument is factually flawed. After careful consideration of the video supplied to this Court, we find that the Suburban entered into the oncoming traffic lane prior to Officer Fowler deactivating his lights. Therefore, this action occurred while Officer Fowler was still engaged in an attempt to stop the vehicle and may be considered as part of the evidence that the Suburban was fleeing police in a

that there was sufficient evidence for a jury to determine that Ryland was driving in a manner that posed a substantial risk of serious physical injury or death during his flight from police. *See State v. Randle*, 456 S.W.3d 535, 542 (Mo. App. E.D. 2015) (There was ample evidence from which the trier of fact could find that Defendant created a substantial risk of harm in his attempt to evade police where he drove erratically, at excessive speeds, ran several stop signs, wove in and out of traffic, and violently swerved, barely avoiding a collision.). Ryland's third point is denied.

### Conclusion

The judgment of the trial court is affirmed.

All concur.

manner likely to cause substantial risk of serious physical injury or death. Even if we were to agree with Ryland on this point however, we find there is still sufficient evidence from throughout the pursuit to support the jury's verdict given that Ryland was driving in excess of twice the posted speed limit, at night, in a high traffic area.